# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>       Plaintiff<br><br>   vs.<br><br>JOHN AND JANE DOES 1-100,<br>And XYZ CORPORATIONS 1-100,<br><br>      Defendants. | Civil Action No. _____<br><br>**DECLARATION OF LAUREN DIENES-MIDDLEN, ESQ.** |

I, Lauren Dienes-Middlen, state that:

1.      I am Senior Vice President, Assistant General Counsel -- Intellectual Property, Business and Legal Affairs of Plaintiff World Wrestling Entertainment, Inc. ("WWE").  I am authorized to make this declaration, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and 15 U.S.C. § 1116(d), in support of WWE's <u>Ex Parte</u> Motion for Temporary Restraining Order, Order of Seizure and Order to Show Cause Why a Preliminary Injunction Should Not Issue.

2.      I certify that I have personal first-hand knowledge about the matters discussed below unless otherwise indicated and am competent to testify about them if called upon to do so.

3.      I have worked at WWE for the last 17 years in connection with, among other things, the acquisition, maintenance, licensing and enforcement of WWE's intellectual property. I also have been involved with WWE's application for and enforcement of temporary restraining orders, seizure orders and preliminary injunctions to stop counterfeiters from selling counterfeit WWE merchandise at WWE live events, where WWE sells a large variety and volume of genuine WWE merchandise.

4.      WWE licenses the right to print, manufacture, distribute, offer for sale and sell merchandise bearing WWE's protected trademarks and service marks to a limited number of entities.  As a condition of each such license, WWE requires that licensees refrain from selling licensed products in the vicinity of any WWE live event.  As a result, WWE is able to control the WWE merchandise that is sold at and in connection with WWE live events.

5.      For each WWE live event, venue merchandise coordinators meet in advance to discuss the merchandise and the market and agree on the logistics of the merchandise sales for the particular event, such as the number and location of the booths, number and location of personnel, how many of each type of shirt or other merchandise to have on hand and other such information.

6.      On the day of each event, the venue merchandise team is present at the arena, coordinates and inspects the sales facilities and plan, and supervises and monitors the overall sales operation for WWE.  After the event, the team oversees the accounting for all sold merchandise, as well as the counting and repackaging of any unsold merchandise, and creates a detailed report summarizing this information.

7.      Because they are intimately familiar with the limited number and types of self-sourced WWE merchandise offered for sale at live WWE events, the venue merchandise coordination team easily can distinguish counterfeit merchandise from legitimate WWE product. Moreover, because of the limited number of licensees who are authorized to print, manufacture, distribute, offer for sale, and sell WWE merchandise, the venue merchandise team also can discern counterfeit merchandise bearing inferior imitations of WWE's protected trademarks and service marks from official, licensed merchandise.  I also have created a mini-booklet that can be easily carried in one's pocket that identifies WWE's authorized merchandise by design so that

2

official, licensed merchandise can be readily distinguished from counterfeit merchandise.  I distribute this booklet to the venue merchandise team to carry with them at all times.

8.      As a result of the increase in counterfeiting activity at WWE live events, in 2008, WWE sought and obtained an Ex Parte TRO and Seizure Order from the Middle District of Florida in connection with WWE's WrestleMania® 24 events at the Amway Arena and the Citrus Bowl in Orlando, Florida.  The court issued the Seizure Order.

9.      At the WrestleMania® 24 events in Orlando, WWE encountered numerous counterfeiters and, pursuant to the Ex Parte TRO and Seizure Order, WWE was able to obtain the identities of some of the counterfeiters (who became named defendants) and seize more than 1,000 counterfeit t-shirts.

10.      Encouraged by this success, WWE sought and obtained an Ex Parte TRO and Seizure Order from the District Court for the Southern District of Texas in 2009 in connection with WWE's WrestleMania® 25 events at the Reliant Center and Toyota Center in Houston, Texas.  Similar to the WrestleMania® 24 events, WWE encountered numerous counterfeiters at the WrestleMania® 25 events and, pursuant to the Ex Parte TRO and Seizure Order, WWE was able to obtain the identities of some of the counterfeiters (who became named defendants) and seize approximately 1,500 counterfeit t-shirts.

11.      I personally attended WWE's WrestleMania® 27 weekend events, held March 30-April 4, 2011, in Atlanta, Georgia, and WWE similarly encountered an untold number of individuals, who came from all over the United States, distributing and selling Counterfeit Merchandise.  With the aid of the Ex Parte TRO and Seizure Order issued by the United States District Court for the Northern District of Georgia, WWE was able to gain some measure of

control over such counterfeiting by seizing more than 3,000 counterfeit t-shirts during the WrestleMania® 27 weekend events.  The t-shirts were being sold for at least $10 per shirt.

12.     From March 29, 2012 through April 1, 2012, I attended WWE's WrestleMania® 28 Weekend Events to assist with the enforcement of an Ex Parte TRO and Seizure Order issued by the United States District Court for the Southern District of Florida and testified before the District Court regarding those and past WWE enforcement efforts.  Attached hereto as Exhibit 1 is a true and correct copy of the transcript from the Preliminary Injunction hearing before the Southern District of Florida.

13.     Despite a substantial police presence at and around each of the WrestleMania® 28 Weekend Events in Miami, Florida, WWE encountered counterfeiters from California, New York, and Florida.   Through enforcement of the Seizure Order, WWE seized hundreds of counterfeit T-shirts.  Many of the counterfeit shirts were identical in design, even though they were sold by different vendors from different states.

14.     Attached hereto as Exhibit 2 is a PowerPoint presentation that I created after the WrestleMania® 28 Weekend Events in Miami, Florida showing the counterfeiting activities WWE encountered.  I presented Exhibit 2 to the District Court in connection with live testimony set forth in Exhibit 1.  The District Court relied upon this Exhibit and my testimony in granting WWE a nationwide preliminary injunction and seizure order.

15.     I was in East Rutherford, New Jersey, from April 4 through April 7, 2013 for WWE's WrestleMania® 29 Weekend Events to assist with the enforcement of the Ex Parte TRO and Seizure Order issued by the United States District Court for the District of New Jersey on March 27, 2013.

301640168 v2

16.     At the WrestleMania® 29 Weekend Events, WWE encountered counterfeiters from California, New York, Pennsylvania and Connecticut.  Through enforcement of the Seizure Order issued by the United States District Court for the District of New Jersey, WWE seized counterfeit T-shirts, DVDs, action figures and posterboards and obtained a permanent injunction against one of the counterfeiters.  Similar to past live events, many of the counterfeit shirts were identical in design, even though they were sold by different counterfeits from disparate locations in the United States.

17.     Attached hereto as Exhibit 3 is a PowerPoint presentation that I created after the WrestleMania® 29 Weekend Events.  The presentation illustrates the counterfeit merchandise that WWE seized during the WrestleMania® 29 Weekend Events pursuant to the court's March 27, 2013 Order.  In addition, the first slide of the PowerPoint presentation shows counterfeit merchandise that WWE encountered in Pittsburgh, Pennsylvania and Cincinnati, Ohio more than two weeks prior to WrestleMania® and that also appeared at the WrestleMania® 29 Weekend Events.

18.     I was in New Orleans, Louisiana, from April 2 through April 7, 2014 for WWE's WrestleMania® 30 Weekend Events, which included WWE's WrestleMania® 30 event at the Mercedes Benz Superdome on April 6.  I personally observed counterfeiting activity in and around the Superdome as well as the adjacent streets.  Because the United States District Court for the Eastern District of Louisiana denied WWE's application for an Ex Parte TRO and Seizure Order, WWE was limited in the actions it could take against the counterfeiters.  I worked with local law enforcement to obtain the identities of four counterfeiters all of whom were selling the identical counterfeit merchandise.

19.     As discussed in WWE's brief, the district court's denial of WWE's application was subsequently vacated by the Court of Appeals for the Fifth Circuit.

20.     I was in San Jose and Santa Clara, California from March 24, 2015 through March 31, 2015 for WWE's WrestleMania® 31 Weekend Events. Following the issuance of a TRO and Seizure Order from the Northern District of California's, WWE engaged the Department of Homeland Security ("DHS") to enforce the Court's Order at WWE's WrestleMania® 31 Weekend Events.

21.     To ensure that all merchandise seized under the Northern District of California's Order was properly designated and attributed to the specific counterfeiter who was served, I instructed DHS to complete a "Venue Enforcement Report."  A "Venue Enforcement Report" is a form that WWE created and has used to collect the following information about the seizure and the individual from whom the merchandise was seized: (1) Date of the Event; (2) Event Venue; (3) Name of Defendant Served; (4) Address of Defendant Served; (5) Time Defendant Served; (6) Type of Merchandise Seized; (7) Quantity of Merchandise Seized; (8) Approximate Height of Defendant; (9) Approximate Weight of Defendant; (10) Ethnicity of Defendant; and (11) Law Enforcement Involved.

22.     For each of the Defendants served during WWE's WrestleMania® 31 Weekend Events, DHS team completed a "Venue Enforcement Report."  Attached hereto as Exhibit 4 are true and correct copies of the "Venue Enforcement Reports" completed by WWE's enforcement team for the Defendants served.

23.     Attached hereto as Exhibit 5 is a PowerPoint presentation that I created after the WrestleMania® 31 Weekend Events.  The presentation illustrates the counterfeit merchandise

that WWE seized during the WrestleMania® 31 Weekend Events pursuant to the Northern District of California's Order.

24.     I was in Dallas and Arlington, Texas from March 29, 2016 through April 5, 2016 for WrestleMania® 32 Weekend Events.  I worked with local law enforcement who WWE engaged to enforce the Ex Parte TRO and Seizure Order issued by the District Court for the Northern District of Texas.

25.     In working with local law enforcement, who insisted on making arrests instead of serving and enforcing the court's TRO and Seizure Order, I personally viewed the counterfeiters and assisted law enforcement to identify the counterfeit merchandise that was being sold during the WrestleMania® 32 Weekend Events.  I personally witnessed one individual who admitted to having travelled from Florida to Texas solely to peddle his counterfeit wares at the WWE event. He was arrested just before WrestleMania® 32 event for selling counterfeit WWE shirts in a nearby parking lot.  While the WrestleMania® 32 event was taking place, he was process and released by local law enforcement.  This same individual was then back out in the parking lot of AT&T Stadium at the conclusion of the WrestleMania® 32 event, selling the identical shirts he had been selling before his arrest only hours before.

26.     Attached hereto as Exhibit 6 is a PowerPoint presentation that I created to document the counterfeit activities I observed at the WrestleMania® 32 Weekend Events.  The presentation also illustrates the counterfeit merchandise that the local police in Dallas confiscated and some of the counterfeit merchandise that WWE encountered leading up to the WrestleMania® 32 Weekend Events and was able to seize pursuant to the nationwide seizure order entered by the District Court in California.  In addition, the exhibit includes pictures of counterfeit merchandise that followed WWE around at its 2016-2017 Live Events after the

WrestleMania® 32 Weekend Events, including identical counterfeit shirts promotion the "Road to WrestleMania" that were sold at WWE Live Events in Minnesota, New York and Michigan.

27.     I was in Orlando, Florida from March 30, 2017 through April 4, 2017 for WrestleMania® 33 Weekend Events in Orlando, Florida to assist local law enforcement who WWE engaged to enforce the Ex Parte TRO and Seizure Order issued by the District Court for the Middle District of Florida.

28.     Attached hereto as Exhibit 7 is a PowerPoint presentation that I created to document the counterfeit activities I observed at the WrestleMania® 33 Weekend Events.  In addition, I have included pictures of counterfeit merchandise that has been following WWE around at its 2017-2018 Live Events since the WrestleMania® 33 Weekend Events, including identical counterfeit "WWE® Live" shirts that display counterfeit WWE Marks and Superstars on the front and a list of WWE® Live events from January through April on the back, including listing the WrestleMania® 34 Event in New Orleans and that have been sold in recent weeks in different cities in the United States where WWE® Live Events have occurred.

29.     Based on my first-hand experiences recounted above, the modus operandi of the counterfeiters operating during WWE's WrestleMania® Weekend Events includes offering to sell the counterfeit merchandise inside the venues where the events were being held, in front of the venues where the events were being held as well as in surrounding streets, in parking areas near the WWE events, areas where traffic becomes congested near the event, and areas between the parking areas and the event venues.

30.     In addition, after the WrestleMania® Weekend Events, counterfeiters will follow WWE's live events around the country selling the same or similar counterfeit merchandise.  For example, attached hereto as Exhibit 8 is a true and correct copy of an arrest report from a WWE

live event in Oklahoma City, Oklahoma, on February 6, 2012 pursuant to the Preliminary Injunction and Order of Seizure entered by the District Court for the Southern District of Florida. The officer seized 27 bootleg WWE T-shirts from the counterfeiter. The counterfeiter, who claimed to be from Las Vegas, Nevada, admitted to the arresting officer that he was standing outside the venue next to a line of people to sell unauthorized WWE T-shirts and that he "follows the WWE around" to sell the T-shirts.

31.     Attached hereto as Exhibit 9 is a true and correct copy of photographs of counterfeit merchandise that WWE seized pursuant to the Preliminary Injunction and Order of Seizure entered by the District Court for the District of New Jersey after WrestleMania® 29. WWE seized the merchandise from various cities on different dates, from different people and yet the artwork on the counterfeit merchandise was identical. WWE does not sell any merchandise that includes this artwork, so the designs were not copied from WWE. Based upon WWE's observation of the unauthorized merchandise sold at WWE live events and the common designs of the merchandise, I believe that the unauthorized merchandise being sold at WWE's live events throughout the country emanates from only a few sources.

32.     WWE is currently promoting and will be presenting a multi-city presentation of live wrestling entertainment events throughout the United States and in many other cities throughout the world beginning on April 5, 2018 and ending on March 26, 2019 (the last currently scheduled WWE® live event before Wrestlemania® 35) ("WWE's 2018-2019 Live Events"). WWE's 2018-2019 Live Events include its WrestleMania® 34 weekend from April 5 through April 10, 2018 in New Orleans, Louisiana. WWE's WrestleMania® 34 weekend will consist of various events taking place in New Orleans, Louisiana, including (1) WWE's Wrestlemania® Axxess event at the New Orleans Convention Center from April 5-8; (2) WWE's

Hall of Fame event at the Smoothie King Center on April 6; (3) WWE's NXT TakeOver event at the Smoothie King Center on April 7; (4) WWE's Wrestlemania® 34 event at the Mercedes-Benz Superdome on April 8; (5) WWE's Monday Night Raw event at the Smoothie King Center on April 9; and (6) WWE's Smackdown® Live event at the Smoothie King Center on April 10 (collectively, the "Wrestlemania® 34 Weekend Events").

33.    The operation of the WWE's 2018-2019 Live Events, including the WrestleMania® 34 Weekend Events, will include, as in the past, offering for sale souvenirs, merchandise and memorabilia bearing trademarks, service marks and logos of WWE (the "WWE Marks").   The WWE live events in past series have attracted, and are certain to continue attracting, the attention of dealers and vendors of merchandise bearing counterfeits of the WWE Marks.   In fact, as shown in Exhibit 7, WWE has already encountered **identical** counterfeit merchandise with WWE Live Event tour dates from January 2018 through the WrestleMania® 34 Weekend Events in different cities across the United States.

34.    Based on my experience detailed above, I expect individuals and groups (hereinafter "Counterfeiters") who, without permission or authorization, misappropriate the WWE Marks for use on counterfeit merchandise (the "Counterfeit Merchandise") to be selling Counterfeit Merchandise at WWE's WrestleMania® 34 Weekend Events from April 5 through April 10, 2018 in this District and I have every reason to believe that they will continue to do so throughout WWE's 2018-2019 Live Events.

35.    Based on my experience, the Counterfeiters sell to the general public to cash in on the enormous commercial value and goodwill contained in, and conveyed by, the WWE Marks. The Counterfeit Merchandise will consist of similar designs that appear at different cities throughout the United States, indicating that the Counterfeit Merchandise is emanating from a

common source.  In fact, some Counterfeit Merchandise display the dates of various WWE live events making it simple for the Counterfeiters to use the same Counterfeit Merchandise at various WWE live events across United States.

36.   Based on my past experience and the activity that I understand has been occurring at recent WWE live events, the Counterfeiters will travel from city to city selling Counterfeit Merchandise at WWE events.  For example, two Defendants in the 2012 case before the Southern District of Florida, Thomas Keane and "Butch" Thomas Ingram, had been previously served at WrestleMania® 24 in Orlando, Florida in April 2008, pursuant to an Ex Parte TRO and Seizure Order.  In addition, two Defendants in the 2014 case before the Eastern District of Louisiana had been previously served in a different state entirely -- at WrestleMania® 28 in Miami, Florida in 2012 pursuant to an Ex Parte TRO and Seizure Order from the District Court for the Southern District of Florida.  None of these Defendants ever made an appearance in court to contest the seizure or otherwise respond to WWE's allegations.

37.   Based on WWE's enforcement of prior Seizure Orders, I have inspected unauthorized merchandise sold by Counterfeiters.  The design, materials and quality of all of the unauthorized merchandise sold by the Counterfeiters is poor and generally uniform from item to item.

38.   Sales of goods bearing counterfeit marks reduce the demand for genuine goods and result in lost sales to WWE that can never be recouped because (a) the Counterfeiters have no regular place of business; and (b) the identity of itinerant Counterfeiters cannot readily be ascertained, and therefore Counterfeiters are not subject to ordinary legal remedies.

39.   Based on my firsthand experiences described above, there is no doubt that the Temporary Restraining Order and Seizure Order now requested by WWE will be essential tools

in retaining control over the unlawful distribution and sale of Counterfeit Merchandise during the WrestleMania® 34 Weekend Events in New Orleans, Louisiana.  I fully believe that the large-scale counterfeiting activities that I have personally witnessed at prior WrestleMania® events, which would have proceeded largely unabated if WWE had been denied the protections of the Temporary Restraining Orders and Orders of Seizure, will reoccur in New Orleans.  Thus, I believe the orders are necessary to enable WWE to effectively coordinate and execute its efforts to protect its genuine trademarks.

40.     Based on my firsthand experiences in Arlington, Dallas, Santa Clara, San Jose, New Orleans, East Rutherford, Miami, Atlanta and Orlando and WWE's prior experiences, the Counterfeiters are part of one or more nationwide counterfeiting rings wherein large volumes of counterfeit merchandise is created in advance of a WWE pay-per-view event, such as the upcoming WrestleMania® 34 event in New Orleans.  After the pay-per-view event has ended, the Counterfeiters will travel to upcoming WWE live events in other parts of the United States with the remaining counterfeit merchandise, setup at these live events and continue to sell the counterfeit merchandise.  They will also continue to produce and sell new WWE-branded counterfeit merchandise.

41.     As described above, the Counterfeiters that WWE has encountered distribute and sell Counterfeit Merchandise at event venues, in surrounding parking lots, on surrounding streets and in local areas where WWE fans are likely to be, such as local area hotels.  At many venues, for example, traffic backs up before and after the event as attendees approach and leave the venue and its parking areas.  To avoid enforcement near the venue, Counterfeiters distribute and sell Counterfeit Merchandise on foot to customers in cars waiting in these traffic back-ups.

301640168 v2

42.     In order to effectively protect WWE's rights, it is necessary for trademark enforcement efforts to begin the day before the actual events that will be the focus of Counterfeiters' infringing activities.   Based on my experience, I believe that Counterfeit Merchandise will often begin to enter the local areas in large amounts the day before each event. Therefore, to most effectively protect WWE's rights, the trademark enforcement efforts, including the investigation of likely manufacturing, distributing and retail locations and the identification of persons and equipment being used to transport Counterfeit Merchandise from manufacturers to retailers and peddlers, should begin 24 hours before each event.

43.     Similarly, it is necessary for trademark enforcement efforts to continue through the day following the actual events that will be the focus of Counterfeiters' infringing activities. Based on my experience, I believe that Counterfeiters often will gather the next day to distribute Counterfeit Merchandise and coordinate further counterfeiting activity.   Therefore, to most effectively protect WWE's rights, the trademark enforcement efforts, including the investigation of likely manufacturing, distributing and retail locations and the identification of persons and equipment being used to transport Counterfeit Merchandise from manufacturers to retailers and peddlers, should continue 24 hours after each event.

44.     Allowing WWE to seize counterfeit goods at and around live event venues enables WWE to discover and investigate at least, the local source manufacturers and distributors of Counterfeit Merchandise.

45.     As a result of its ability to seize Counterfeit Merchandise at live events, WWE successfully has avoided live event sales that otherwise would have resulted from the distribution of Counterfeit Merchandise by a given source.   Enforcement in this manner is the optimal, most

judicially and practically efficient means of combating merchandise counterfeiting, and it is possible only via the ex parte seizure process.

46.     As demonstrated, the ex parte seizure process has aided WWE tremendously in bringing counterfeiting under a measure of control, and any hopes of WWE retaining such control over the unlawful distribution and sale of Counterfeit Merchandise at live events and elsewhere, and thereby effectively protecting its intellectual property rights, rests upon the continued availability of ex parte seizure relief.

47.     I understand that of the scores of Counterfeiters served under various orders of seizure in the past, very few identified themselves, and not a single one registered an objection with the court in connection therewith.  It is my understanding that Counterfeiters who have been caught prefer instead to cooperate peacefully and simply turn over their illegal merchandise without incident and lie low until a WWE live event in the future, hoping next time to evade enforcement.

48.     Genuine WWE goods are of the highest quality and grade and all such authentic WWE Merchandise bears an official label or other indicia of authenticity.   Counterfeit Merchandise does not.  It is typical for the goods bearing counterfeit marks to be lower in price and quality than goods bearing genuine marks.  Because the quality of materials used by the Counterfeiters is not and cannot controlled by WWE, I understand that there is a safety risk to the public with regard to the materials that are actually used to manufacture the Counterfeit Merchandise (e.g., the Counterfeit Merchandise does not meet flammability standards).  In fact, at the Preliminary Injunction hearing before the District Court for the Southern District of Florida in 2012, the Court when presented with the Counterfeit Merchandise that was seized noted the very strong chemical odor emanating from shirts, remarking that the Court did not

"even have to have it close to my nose" to notice the smell.  <u>See</u> Ex. 1 at 32-33.  In addition, as a large percentage of the Counterfeit Merchandise is intentionally child-sized, there is a particular safety risk to children for whom parents might unknowingly purchase these inferior quality and potentially dangerous shirts.

49.     If Counterfeiters are permitted to sell goods bearing counterfeit marks, WWE will be irreparably harmed by the inferior quality counterfeit merchandise, as (i) WWE's reputation for the manufacture and sale of only the highest quality souvenirs, merchandise and memorabilia will be tarnished, and (ii) the company's well-established and invaluable customer goodwill and confidence will be eroded.

50.     Indeed, unless goods bearing counterfeit marks are seized from the Counterfeiters, such goods will enter the marketplace to the permanent, irreparable detriment of WWE and pose a safety risk to the public.

51.     If the Counterfeiters are alerted to the existence of this action or WWE's motion for Temporary Restraining Order and <u>ex parte</u> Seizure Order, I believe they will conceal or otherwise render the goods bearing counterfeit marks inaccessible to the Court but still available for future distribution and sale.

301640168 v2

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of March, 2018 in Stamford, Connecticut.

_Lauren Dienes-Middlen_
Lauren Dienes-Middlen
Senior Vice President, Assistant General Counsel --
Intellectual Property, Business and Legal Affairs
World Wrestling Entertainment, Inc.

# EXHIBIT 1

```
                UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
                     MIAMI DIVISION
                 Case No. 12-21018-CV-SEITZ

WORLD WRESTLING ENTERTAINMENT, INC.    MIAMI, FLORIDA
                   Plaintiff,
                                       April 3, 2012
        Versus                         VOLUME I

                                       PAGE 1 TO 49
DANIEL ROSHAWN THOMAS, ET AL.
                   Defendants


                  PRELIMINARY INJUNCTION
            BEFORE THE HON. PATRICIA A. SEITZ, J.
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:

                        JONATHAN B. MORTON, ESQ.
                        ROBERT C. LEITNER, II, ESQ.
                        K&L Gates LLP
                        Wachovia Financial Center
                        200 S. Biscayne Boulevard - 39th Floor
                        Miami, FL  33131-2399


FOR THE DEFENDANT:

                        NO APPEARANCES




REPORTED BY:            DAVID S. EHRLICH, RPR
                        Official Court Reporter
                        Wilkie D. Ferguson, Jr.
                        U. S. Courthouse
                        400 N. Miami, Room 11-4
                        Miami, Florida 33128-1810
                        (305) 523-5537
```

25

```
                (Court reconvened at 10:03 a.m.)
 2          LAW CLERK:  Case Number 12-21018, World Wrestling
 3  Entertainment, Inc. Vs. Daniel Roshawn Thomas, et al.
 4          MR. MORTON:  Hello, Your Honor.
 5          THE COURT:  Can you state your appearance, please?
 6          MR. MORTON:  Yes.  Jonathan Morton and Rob Leitner from the
 7  law firm of K&L Gates representing the WWE, and Lauren
 8  Dienes-Middlen from the WWE.
 9          THE COURT:  Okay.  Please have a seat.
10          It is four minutes after ten.  This hearing was set to
11  commence at ten o'clock to the named and unnamed defendants to show
12  cause why a preliminary injunction should not be entered.
13          At this time, Mr. Morton, if you would like to put on your
14  witness to establish the basis for a preliminary injunction, I'll be
15  happy to hear that.
16          Let the record reflect that there's no one here in the
17  courtroom.  I believe we can -- The courtroom is unlocked, correct,
18  Officer?
19          COURT SECURITY OFFICER:  Yes, Your Honor.
20          THE COURT:  And I'm going to enter an order unsealing all
21  of the matters that have thus far been under seal.
22          MR. MORTON:  Okay.  Thank you, Your Honor.
23          THE COURT:  And if you've got a copy of that order with
24  you, I'll sign it.
25          What I need to know are greater specifics.  I received your
```

1  proposed preliminary injunction order, and let me share with you a

2  couple of thoughts before we commence.

3          MR. MORTON:  Sure.

4          THE COURT:  I need to have more facts as to the particular

5  seizures, the particular people that were identified, what was

6  seized, where it was seized, those kinds of details.  I don't have

7  any of that yet.

8          Secondly, I did look at the law that you provided as far as

9  a nationwide injunction, but it is not appropriate under the law to

10 have a nationwide seizure order, because the statute is very

11 particular as to the duration of a seizure order and the

12 particularities that have to be satisfied before a seizure order can

13 issue.  So, you'll have to do it in every single jurisdiction.

14         MR. MORTON:  Okay, Your Honor.  I'd like to make some

15 argument on that, Your Honor, if --

16         THE COURT:  I don't think you're going to be able to change

17 my mind, but I'll always hear you.  The statute really precludes it.

18         MR. MORTON:  Well, Your Honor, a couple things on the

19 statute.  If you look at --

20         THE COURT:  I'm looking at 15 U.S.C. 1116(d)(5).

21         MR. MORTON:  Okay, Your Honor.  If you go to -- 1116(d) is

22 definitely the controlling issue in this case.  And if you look at

23 two things on 1116, one, of course, is 1116(a) which talks about a

24 nationwide injunction.  It definitely provides the Court with the

25 right to give a permanent injunction nationwide.

1           Second, Your Honor, if you look at 1116(10)(A), that it's

2   interesting in the fact what it talks about is the fact that upon a

3   hearing such as this --

4           THE COURT:  Unless waived by all the parties.

5           MR. MORTON:  Well, I'm -- let me go to the part that is in

6   1116(a).  It also talks about the fact that if a Court finds that

7   there's failure of proof, that the Court could dissolve or modify

8   the order, which seems to indicate certainly if there was a proof,

9   you can modify a seizure order, but it also implicitly states then

10  that, of course, if we make the proof, that we keep the seizure

11  order.

12          And I'd like to cite you, also, to the one Circuit Court

13  that's discussed this issue -- most of these cases haven't gone up

14  to a Circuit Court, but the Third Circuit --

15          THE COURT:  Did you bring copies of that decision?

16          MR. MORTON:  Yes, Your Honor.  It's in our papers, but I

17  have copies too.

18          In this case -- It's called Vuitton vs. White.

19          THE COURT:  How do you spell it?

20          MR. MORTON:  V-U-I-T-T-O-N.

21          THE COURT:  Oh, Louis Vuitton.  Okay.

22          MR. MORTON:  Yeah, Louis Vuitton vs. White, right.  And

23  that case involved a -- It did involve only a TRO, in which the

24  Court felt he didn't have power to enter a seizure order.  It dealt

25  with a TRO.

1        (Off-the-record discussion.)

2        MR. MORTON:  Let me slow down, Your Honor.  I apologize for

3  that.

4        What happened in this case -- This was a Third Circuit

5  case, and what happened was the District Court refused to enter a

6  TRO, and Louis Vuitton, the counsel, they decided to appeal.  And

7  what the Court looked at was whether or not it had the power to

8  enter into a seizure order, and it found that it did.  And what it

9  found, what I found interesting, and one of the things that we'd

10  like to show the Court, was --

11        THE COURT:  Give me a copy of the case.

12        MR. MORTON:  I do have a copy.  I had my highlights on it.

13        THE COURT:  You didn't bring me an extra copy?  You didn't

14  bring me an extra copy, if you were going to be citing it?

15        Just give me the cite.  I'll pull it up.

16        MR. MORTON:  The cite, Your Honor, is 945 F.2d 569.

17        If you look at the bottom of the first column as it goes

18  into the second column, the Court discusses what is the difference

19  between injunction and seizure order, and what it finds is that

20  if -- The Court found that what Congress meant when discussing the

21  injunction was also a seizure order.  The seizure order is part of

22  the injunctive relief that a Court can grant.

23        Now, again, it was part of a TRO, but I think that language

24  is instructive.  And I think it's part of -- you know, I think when

25  courts have looked at the statute, they have found that they can

1    use -- that when Congress passed and said you can have an injunction

2    nationwide, that it certainly meant to have a seizure order, because

3    without a seizure order in these type of cases, then there would

4    really be no relief.  In fact, that Court discusses the fact that

5    without a seizure order, the plaintiffs, such as WWE, or any concert

6    tour, or anybody dealing with bootleggers, would have no remedy.

7    And that was the other case that we cited, the SKS Merchandise case,

8    where the Court found the same thing.

9         And I understand that -- We also cited a lot of other cases

10   that have all come to the same conclusion, that without the seizure

11   order, there really is no relief for the WWE.

12        We can talk more about the factual issues behind that, if

13   you would like some testimony on that, but as you see here, we

14   served folks.  In fact, we served a number of folks multiple times,

15   even during this weekend, in multiple events.  They keep coming back

16   with the same merchandise.  The address that they were given are

17   from all over the country, and they'll be following this tour

18   around.  Without a seizure order, there really is no relief.  We can

19   serve them as many times as we want to, but they're not going to

20   show up.  We're not going to have a remedy against these people.

21        If you look at the purpose behind 1116(d), it would seem

22   very strange that Congress would say you could have a seizure order

23   for locally, for ten days, but then you couldn't have one as you're

24   going around on the nationwide tour.  It would really leave us

25   without a remedy.

1          You suggested we could file in each city, but I don't think

2    that's what Congress intended, and it's also not what can be done on

3    a practical basis.  It's cost prohibitive.  It takes time and effort

4    to educate a judge and to come here and to write our papers and to

5    get a temporary injunction.  And the amount of counterfeit goods

6    that are seized at one event doesn't justify it.

7          Now, it does justify -- We're still not going to be able to

8    probably get back what we spent on this -- at this hearing

9    nationwide, but at least it gives us some ability to take -- to get

10   counterfeit goods off the street and to get them away from kids and

11   to protect the safety and the integrity of our marks and also the

12   safety of our fans.

13         So, I don't think there is anywhere in the statute or any

14   intent on Congress to say, when they looked at this problem and

15   looked at this issue and found that a seizure order was the only

16   remedy, that it was only a remedy that we could get was for a

17   Temporary Restraining Order (sic), but that we couldn't get the same

18   type of seizure order through injunctive relief on a nationwide

19   basis.

20         THE COURT:  I'm looking at the statute.  Do you have a copy

21   of the statute in front of you?

22         MR. MORTON:  Yes, I do.

23         THE COURT:  If you would look at 15 U.S.C. 1116(d)(5), and

24   it states:  "An order under this subsection shall set forth, A, the

25   findings and facts and conclusions of law required for the order; B,

1  the particular description of the matter to be seized and a

2  description of each place at which such matter is to be seized; and,

3  C, the time period, which shall end not later than seven days after

4  the date on which the order is issued during which seizure is to be

5  made; and, D, the amount of security required to be provided under

6  this subsection; and, E, a date for hearing required under

7  paragraph 10 of this subsection."

8          So, all of those contemplate that a seizure order goes hand

9  in hand with a TRO for the particular event that is occurring.  And

10  it needs to be specific as to what exactly you're seeking to seize,

11  where it's going to be seized, and that the order does not last more

12  than seven days.

13          I can't ignore the clear letter of the law.

14          MR. MORTON:  That's right, Your Honor.  But then you look

15  at what happened, and that's --

16          THE COURT:  And TROs are different from injunctions, and a

17  seizure order is the equivalent of an injunction.  It's the same

18  thing as authorizing a search warrant.  And any search warrant that

19  you authorize for law enforcement has to be very particularized.  It

20  isn't just a blanket search warrant that says you can go out

21  anywhere in the country and wherever you find people violating the

22  law, you can stop and arrest them -- I mean stop and seize their

23  stuff.  I don't have that case, and you haven't made that case for

24  me that I can ignore this clear letter of the law.

25          MR. MORTON:  Well, two answers, Your Honor.

1          First, we've cited a number of cases which have found that

2    such relief is permitted, and we cited those to you.

3          THE COURT:  But there's a distinction between an injunction

4    and a seizure order.  I haven't had a chance to study the case

5    Vuitton vs. White, at 945 F.2d 569, 1991, which you say is a Third

6    Circuit decision, in light of the argument that you're now making.

7    I'll be happy to go back and read it.

8          MR. MORTON:  We also cited the SKS Merchandise case at

9    233 F.Supp.2d 841, which also provides that preliminary injunction

10   may be enforced by the seizure of any merchandise and consistent

11   with any other applicable laws.

12          So, in the SKS Merchandise case that we cited to you, it

13   did permit a preliminary injunction through the issue of a seizure

14   order.  So, there is case law out there that supports that, and I

15   believe we cited some other cases, unpublished decisions, that also

16   allowed for seizures on a nationwide basis.  I think those were

17   cases that we sent to you along with our -- in our packet with the

18   TRO motion.

19          And I'd also like, again, to cite to you, as far as the

20   statute goes, is at Section (10)(A), which talks about what occurs

21   at this hearing.  And the hearing definitely states that the seizure

22   order can be dissolved or modified upon a lack of proof.  But I

23   think that's an indication that upon the making of proof, which I

24   believe we will do here, that a seizure order is appropriate after

25   this for preliminary injunction purposes.

1        THE COURT:  Give me the authorities that say clearly that

2  that's what I can do.

3        MR. MORTON:  Okay, Your Honor.  I cited that case, but we

4  can certainly give you a memo or, if you want to, a list of cases

5  which have permitted this -- permitted seizure orders --

6        THE COURT:  I think you've already given me -- You're not

7  going to give me anything different than what you've put in your

8  motion for your Temporary Restraining Order, are you?

9        MR. MORTON:  No, Your Honor.

10        THE COURT:  So, why do you need to give me anything else?

11  If you've got something new, I'm happy to hear it.  I'm just not

12  persuaded that I have the authority to grant what you are asking me

13  to grant.

14        I understand the logic.  I can see how it is more cost

15  efficient to you to have that.  It's just I'm looking at the statute

16  that Congress wrote.

17        Remember, I'm not an activist judge.

18        MR. MORTON:  I understand that, Your Honor.  And I do think

19  the plain language -- And that's why I wanted to cite you to

20  Section (10)(A).  I think the plain language does allow you to issue

21  a seizure order as part of the injunction.  And that's why we cited

22  to the Third Circuit.

23        THE COURT:  But what particular part of (10)(A) that

24  specifically says the Court can issue a seizure order nationwide?

25        MR. MORTON:  Well, Your Honor, what it says in (10)(A) is

1  we have the hearing, and then it states if that party -- and at the

2  last sentence of (10)(A), it says if that party "fails to meet the

3  burden at the hearing, the seizure order shall be dissolved or

4  modified appropriately."

5          So, it seems to me, Your Honor, if we didn't meet our

6  proof, and you could modify the seizure orders in the preliminary

7  injunction, then certainly if we didn't meet our burden, which we

8  will today, then you could enter a seizure order.

9          THE COURT:  But I've already entered a seizure order, and

10  I'm permitting you to keep and destroy what has already been seized.

11          MR. MORTON:  Right.  And what we're asking for, Your Honor,

12  is to have that seizure order as part of the preliminary injunction

13  going forward against -- we have named defendants, certainly going

14  against them, and all people acting in active concert and

15  participation, as provided by Rule 65.

16          THE COURT:  But you want to seize things in other states.

17          MR. MORTON:  Correct, Your Honor.

18          THE COURT:  How do you enforce that seizure order?  Making

19  them come to Florida?  I don't think so.  And I have no control over

20  you that you're not going beyond the limits of the seizure order.

21  And my seizure order was only four locations here in Miami.

22          MR. MORTON:  Well, that's correct, Your Honor.  And

23  certainly as part of the preliminary injunction order -- Well, I

24  would respond two ways.

25          First of all, the defendants that we did serve were here.

1  So, for those people, ordering an injunctive relief, they have been

2  here, and if we wind up seizing other jurisdictions, you certainly

3  have personal jurisdiction.  They were here.  They were served here.

4  You certainly have personal jurisdiction over them.

5        Second, if you wish, Your Honor, to put into the

6  preliminary injunction the fact that if somebody wants to contest --

7  which we'll have testimony that nobody has ever contested these

8  things, because that's part of the issue here and part of what the

9  findings of Congress were, that people don't show up.  That's the

10 issue.  But if you wanted to give extra protection, we would

11 certainly consent that if we were to serve somebody outside this

12 jurisdiction, and they wanted to contest, that we would be willing

13 to contest and move this case or have it transferred for purposes of

14 contesting that -- a seizure in the jurisdiction in which they are

15 located.

16        THE COURT:  And by what vehicle do you do that to change

17 venue?

18        MR. MORTON:  We could do it by a motion -- by a transfer

19 motion or whatever vehicle this Court finds.

20        THE COURT:  Have you done that before?

21        MR. MORTON:  No, Your Honor, because nobody has ever shown.

22 I mean that's really the crux of the issue here, and that's the crux

23 of why the statute was passed, is because they don't show.  I mean,

24 if -- We can put testimony on, and maybe we can continue this

25 argument -- the legal issues after we hear the factual testimony,

1  but the problem is they don't show up.

2        The way it works now is, they send out -- the

3  counterfeiters send out folks with a limited number of counterfeit

4  goods.  And they get approached, and they know if they cause an

5  incident, they could get arrested.  So, they don't.  What they do is

6  they turn over the goods, we get them, they go back, they either get

7  more goods, and they come back and they sell again.  The testimony

8  will show we had at least four people who we served on multiple

9  occasions.  They're never going to --

10       THE COURT:  Why didn't you see them and get them arrested

11  for violation of the court order?  Why didn't you ask to have them

12  arrested?

13       MR. MORTON:  We had a seizure order, Your Honor, so we

14  served them, and we seized their property.

15       But the real problem we have here is the fact that we

16  can't -- They go -- They're not going to contest, because they don't

17  need to contest and they don't want to contest.  They're probably

18  giving us -- History shows they give us fake addresses.  There's

19  just no relief that we can get.

20       And these are also people who are just -- They're the ones

21  who actually are selling the goods.  It may not be the people who

22  are actually manufacturing are behind this.  They're at these big

23  events, we can't track them, and that's the issue.  And that's what

24  Congress found.  That's why I cited that one case to you, because

25  that is the issue here and that is the problem here.  And I don't

1 think Congress, when dealing with this issue, meant for it only to

2 be a temporary seizure and to require us to do this at every single

3 jurisdiction.  I don't think that would be --

4         THE COURT:  Why wouldn't Louis Vuitton coming in and having

5 a seizure at a particular site here, why then did they have to file

6 any suit in the state of Washington or the state of California if

7 your principle was the viable one?  As I understand it, Louis

8 Vuitton still may have gotten a seizure order for seizing here, but

9 then goes off --

10        MR. MORTON:  Correct.

11        THE COURT:  -- and their products are sold nationwide.

12        MR. MORTON:  Correct.  And I don't know Louis Vuitton's

13 business, but let's presume what they're interested in is not a

14 tour, but certainly Louis Vuitton -- I don't know -- has a certain

15 market.  So, maybe there's one -- a market in Miami, there's a

16 market in Seattle, Washington, a market in Omaha, Nebraska, and

17 they'll have to go to each jurisdiction for those markets.  And that

18 may be what they do.  I don't represent Louis Vuitton.  I've not

19 thought through their legal issues.

20        Our issues are different than Louis Vuitton's, though,

21 because we have a nationwide tour.  And we have folks who are

22 following our tour and who are selling these counterfeit goods.  And

23 that's the market that we are -- Those are the folks that we are

24 trying to prevent from counterfeiting, and those are the folks who

25 we're asking for an injunction against and -- against those folks

1  and people in active concert with those folks.  They have been here

2  in Florida.  They clearly, I think, have a right under -- to do

3  nationwide injunctive relief.

4       I believe, also, under the statute, that I don't think the

5  Congress meant for us to have injunctive relief where we go and say,

6  "We have an injunction against you," but what is that really going

7  to get us?  It doesn't get us relief.  And that's what the

8  SKS Merchandise case really discussed, is the fact that it doesn't

9  get us relief.  And the Court found there that why the Congress

10 passed the statute was to give relief.  And courts have found, even

11 before the statute was passed, in some of the cases we cited, that I

12 think the Court has also some equitable powers too.  I think at the

13 end of the day, mostly with the statute, is that the statute was

14 there to provide relief.  Reading it the way this Court will read it

15 will really provide us some limited relief, and we appreciate the

16 relief down here in Miami, and we thank you for that, but it doesn't

17 provide us with relief that is needed, which is to protect

18 counterfeiting on our tour.

19      As we'll go through the testimony, this tour moves very

20 quickly from city to city to city, and I see nothing in the case law

21 anywhere which has required a concert tour or a WWE tour, or

22 whatever the tour is, to go to city to city to city to do this.

23      What that SKS Merchandise case discussed, and the other

24 cases that we cited to you, and admittedly with not a lot of

25 analysis behind it, but they all reached the same conclusion that

1 this was the intent of Congress, and this is the relief that is

2 needed to protect against the counterfeiters.  Anything else simply

3 means that the counterfeiters are going to be able to continue

4 counterfeiting their goods against the WWE and selling them and

5 really leaving the WWE with no relief.

6       THE COURT:  Okay.  Let's hear the testimony.

7           LAUREN DIENES-MIDDLEN, sworn.

8       **DIRECT EXAMINATION**

9       **BY MR. MORTON:**

10 Q.   Can you please state your name and address for the record?

11 A.   Lauren Dienes-Middlen.  My home address is 13 Lacy Lane, in

12 Norwalk, Connecticut.  Zip code is 06854.

13 Q.   And where are you currently employed?

14 A.   I'm currently the vice president of intellectual property at

15 World Wrestling Entertainment.

16 Q.   And have you been down here in Miami during the past weekend?

17 A.   Yes, I have.

18 Q.   And did you play any role in the seizure efforts during this

19 past weekend?

20 A.   Yes.  I was overseeing all of the off-duty officers hired to

21 enforce on the TRO.

22 Q.   And did you put together a PowerPoint presentation to help us

23 for this hearing?

24 A.   I did.  I gathered the evidence and took pictures and thought

25 it might be a bit of a visual aid to explain what happened this

1  weekend and how it worked.

2          MR. MORTON:  Your Honor, could we approach with the

3  PowerPoint, the demonstrative exhibit?

4          THE COURT:  Certainly.

5          MR. MORTON:  And I have one for the clerk, if she would

6  like one.

7          THE COURT:  Thank you.  Very thoughtful.

8          LAW CLERK:  Thank you.

9  Q.   If we could, let's just turn to the first page, which is

10 entitled "WrestleMania 2012, 78,363 attendees."

11      Can you tell us what this picture is?

12 A.   Sure.

13      This picture is for one part of Sun Life Stadium during the

14 WrestleMania event.  There were in attendance 78,363 attendees,

15 which came from all 50 states, as well as 36 different countries, to

16 attend this event.

17          THE COURT:  How do you know that?

18          THE WITNESS:  I know that because I checked with the --

19 this morning, actually -- confirmed this information from the person

20 who was in charge of the WrestleMania events this weekend, and they

21 can tell from credit card receipts and credit card purchases where

22 the fans bought their tickets, from travel packages that we have put

23 together, where they have come from.

24          THE COURT:  Thank you.

25          THE WITNESS:  You're welcome.

1   A.   And I took this picture mainly to show the number -- the sheer

2   size of the event and the number of fans that attend the event.

3   Q.   And if we go to the second page, it shows a police presence.

4   Can you tell me about the police presence at the event?

5   A.   The -- I have to say Miami does a wonderful job with their

6   police force.  They were -- It was an extremely large police

7   presence at all of our events, and I tried to take some pictures to

8   evidence how they were in attendance at every entrance to any venue

9   that we had, and not just one car here, one car there, but in

10  multiple police cruisers, and out on the streets, and in every facet

11  and every location.  And one of the reasons I took these pictures is

12  to show how difficult it was for bootleggers to actually be open and

13  obvious while they were selling the counterfeit merchandise.

14          THE COURT:  There are four pictures on this second page.

15  Starting in the upper left-hand corner and going clockwise, where

16  are those pictures taken?

17          THE WITNESS:  All of these pictures, Your Honor, are

18  outside and near the Sun Life Stadium.

19          THE COURT:  So, all four pictures at the Sun Life Stadium.

20          THE WITNESS:  That's correct.

21          THE COURT:  And that was for the Sunday event.

22          THE WITNESS:  Correct.

23          THE COURT:  Okay.

24  A.   And I've confirmed with Rich Herring, who was at the video

25  conference at our trial earlier, that there were over 300 police

1  personnel coordinating and attending all the events.

2          THE COURT:  This was just at the Sun Life.

3          THE WITNESS:  300 throughout the weekend.  There were

4  definitely about 200 during the Sun Life Stadium event itself.  But

5  just to clarify, they were not there for bootleg enforcement; they

6  were there for crowd control and safety purposes.

7  Q.   That was going to be my next question, which was:  The police

8  did not help in any way with the seizure efforts; is that correct?

9  A.   No.

10 Q.   Okay.  And the next picture is also -- just shows -- Let me ask

11 you this question.  What does the next picture, on page 3, the next

12 three pictures show?  It says:  "On the roads leading to the events

13 as well."

14 A.   These three pictures are a little further away from the

15 stadium, roads leading to the stadium, and surrounding parking lot

16 areas to the stadium.  Again, for the WrestleMania event held on

17 Sunday.

18          THE COURT:  Are these police officers in the vests?

19          THE WITNESS:  Yes, they are.

20          THE COURT:  Or are they crowd control folks?

21          THE WITNESS:  They are police officers.

22 Q.   And the fourth picture, next slide, says:  "Counterfeiters were

23 found selling bootleg merchandise."

24     First of all, what is this a picture of?

25 A.   This is a picture of the convention center.  This is where

1 Axxess -- WrestleMania Axxess was held from Thursday, the 29th, up

2 until Sunday, the first.  And this --

3          THE COURT:  That was at Miami Beach, correct?

4          THE WITNESS:  Yes, that's correct, Your Honor.

5 A.   And the venue on the left, as you can see from my arrows, is

6 where the WrestleMania Axxess, which is that interactive fan

7 experience that we had -- that's that venue.

8      And on the right is one of the fan parking lots.  And if you

9 can see, the picture is a little dark, but in the middle is the

10 corner on the Axxess venue property where bootleggers were found

11 standing, although -- They tried to blend in with the crowd, because

12 there was such a police presence.  But we were able to spot them.

13          THE COURT:  Okay.

14 A.   And what's interesting is that -- and what's typical is that

15 the fans had to actually pass them from the parking lot into -- to

16 get inside the venue.  So, they had to pass by them, which made it a

17 prime location for them.

18 Q.   Okay.  Let's go to the next picture.

19 A.   This next picture is a picture I actually took of one of the

20 counterfeiters selling shirts.  This is at WrestleMania.  This is

21 across the street from WrestleMania, again, on the path leading from

22 one of the parking lots towards the Sun Life Stadium.  And if you

23 see those yellow lines above his waist and ankle, those are actually

24 police lines that they put up so that the fans have to stay on the

25 sidewalk; they can't walk on the street.  So, they actually have to

1  pass this guy again to get to the venue where the event will be

2  held.

3         THE COURT:  Did you find out this person's name?

4         THE WITNESS:  Unfortunately, no.  I took the picture, and I

5  believe he -- I know he saw me take the picture, and I called it in

6  to the head of the security who was working with us, and by the time

7  they got there, he was gone, blended in the crowd.  We believe we

8  saw him again later, couldn't catch him.

9  A.    But what is interesting is what he was saying.  He was holding

10 up the shirt, as you can see.  He has a bag on his left shoulder

11 containing the other shirts, and he was saying, "Get your

12 WrestleMania shirts here, half price here rather than inside."  And

13 people were buying from him, which is why I noticed.

14      When one person is standing in a crowd that's moving, and there

15 are people around him, my eye is trained now to notice that there's

16 some kind of activity that we need to look at.  So, I turned the car

17 around and made a U-turn and got the picture.

18 Q.    Then the next picture just shows --

19 A.    The next picture I took outside Sun Life Stadium, and this is

20 towards the end of the event.  We found that the counterfeit product

21 was being sold typically before the event, for hours leading up to

22 the events, not so much during the actual event, because the fans

23 are inside.  But then on what they call the "blowoff," which is a

24 term of art in this industry, which means that after people are

25 leaving the event going back to their cars, it's a quick sell.  Try

1  to run, try to sell whatever they have in inventory on their

2  shoulders at the moment.  And it's called a blowoff by undercover

3  police.  It's something I learned as well.

4       But they would sell in the parking lots, and they would sell on

5  the sidewalk as they're coming out.  And a lot of these is where we

6  get what's called the "drop and run," where they're not providing

7  any ID.  If they see one of our undercover or off-duty officers

8  approaching them with the packet, with the seizure order, they know

9  what it's about.  They just hand over the stuff and run.  They don't

10  stay to give ID.

11       But this is where they really try to sell it.  But it's very

12  difficult, because, as you can see, although the pictures are

13  somewhat dark, it's a crowded parking lot, and it's nighttime, and

14  it's very hard to find them and very hard to get them.  But we did

15  manage to get about 72 shirts last night, just in that time alone.

16            THE COURT:  So the event was still going on, on April 2nd?

17            THE WITNESS:  Last night was Raw.  I'm sorry.  Last night

18  was Raw.  This was Sunday night.  We did manage to get shirts that

19  night too.  I don't remember offhand how many were specifically at

20  the blowoff time versus how many were going in.

21       **BY MR. MORTON:**

22  Q.   Let's talk about the shirts.  I know we have some pictures here

23  in this PowerPoint, but we also brought in some shirts for the Court

24  to see.

25       We have two bags over here to my right.  Can you tell us --

1 There's a big bag and there's a smaller bag. Can you tell us what

2 these two bags are? And I'll lift them up so the Court can see.

3 A. Sure.

4 These are merely one fraction of the number of shirts that we

5 saw. We just couldn't physically carry them all into the courtroom.

6 They're in my trunk, actually, at the moment. We have over 300

7 shirts that were seized.

8 The bag that Mr. Morton is holding up right now is one of the

9 bags that was seized last night. And they're in bags because what

10 we have instructed our off-duty officers to do is -- I provide them

11 with the clear bags, and from each individual, they put it in a

12 single bag. So, they're not commingled.

13 THE COURT: Good.

14 A. In that single bag, they put in what's called a "venue

15 enforcement form" -- which I know we've submitted to the Court, and

16 we have the originals here -- as well as the service of process.

17 And for each individual, that goes inside that plastic bag, until

18 it's handed over to me or to the attorneys. And then we take that

19 out, put a note inside the bag as to which form that corresponds to,

20 so we know exactly which bag is seized from which individual and

21 which shirt they sold and how many of them they sold.

22 So, these are just from two individuals that you're seeing

23 right here.

24 MR. MORTON: Your Honor, if I may be permitted, we do have

25 the affidavits of service from the law (sic) enforcement. If I

1  could, I could approach and enter those into evidence?

2          THE COURT:  Okay.  How many affidavits are there?

3          MR. MORTON:  I have them right in front of me.

4          (Handing to the witness.)

5  A.   There were 14 different individuals served, but as you'll see,

6  there are more affidavits, because some were served more than once.

7          MR. MORTON:  And, Your Honor, there's two packets.  The

8  first, the larger packet, that starts with number one, are the ones

9  that were served before last night's Raw, and those have been

10  included in the proposed order that we sent to you.

11          The second smaller packet was what was seized last night,

12  during the event last night, which was between nine and 11 o'clock

13  last night, which was called the Raw event down at the American

14  Airlines Arena.

15          THE COURT:  I thought you said the large package was the

16  Raw.

17          MR. MORTON:  No.  The large packet was everything before

18  the Raw event, all the other events before last night, and that's

19  what we were able to put into the proposed order.  Last night -- The

20  smaller packet is what we seized last night during the Raw event.

21          LAW CLERK:  Those have not been filed in the docket.

22          THE COURT:  All of these will need to be filed.  I'm going

23  to give them back to you so that you can file them.

24          MR. MORTON:  Okay, Your Honor.

25          THE WITNESS:  And, Your Honor, if I might answer one of the

1  questions you asked earlier about individuals who were served more

2  than once.  There were different off-duty officers on staff at

3  different times, and they might not have realized that that person

4  had already been served.  It's only after we brought those forms

5  back and we were typing up the information on the lists that we were

6  able to compare and figure out, oh, this person was already served

7  earlier the other day.

8        THE COURT:  That is very important information as part of

9  your proof, so you need to organize that.  I'm not here to make your

10 case.  You're here to make the case.  But --

11       MR. MORTON:  We would like to ask about a few of these

12 people.

13           **BY MR. MORTON:**

14 Q.   One of these folks, Mr. Thomas Keane, was he served on multiple

15 occasions?

16 A.   He was served on multiple occasions.  And I believe he was the

17 one who had been served in the prior -- under prior seizure order

18 in -- I think it was 2008.  So, he's not only a repeat offender this

19 weekend, but he's coming back from other years.  And he had not

20 appeared in court to answer to anything then either.  And I don't

21 believe he will now.

22 Q.   And Mr. Keane, did he give -- Did you notice anything

23 interesting about the addresses that Mr. Keane gave?

24 A.   I believe they were different addresses each time that he

25 provided the --

1          THE COURT:  Mr. Who?

2          MR. MORTON:  Thomas Keane, K-E-A-N-E.

3          THE COURT:  I'm looking at Daniel R. Thomas, and you're

4  saying that there's --

5          THE WITNESS:  They're different, yeah.

6          THE COURT:  Mr. Thomas got served a number of times.

7          THE WITNESS:  Yes.

8          MR. MORTON:  Yeah, a bunch of them got served a number of

9  times.

10          THE WITNESS:  There was one individual, I believe, who was

11  served three times during the events.

12          **BY MR. MORTON:**

13  Q.   And how does that occur?  How does a person get served multiple

14  occasions?

15  A.   When the off-duty officers will locate them, again, they seize

16  all the merchandise on hand, and that's kind of key.  It's what they

17  have on hand.  They don't have their entire inventory with them,

18  because they probably know they're going to get seized.  And we take

19  everything they have.  We provide them with a packet, which I can

20  show you even the packet we give them, and it contains a receipt for

21  goods seized as well as a notice -- a service of process, a copy of

22  the order, the complaint, and the exhibits.  And then the officer

23  fills out, as well, the service of process as well as a venue

24  enforcement form listing how many shirts, the description of the

25  individual served, as well as what date, what time, and at what

1  event and location the service was made.

2  Q.   Did you have a chance to take a look at the shirts that were

3  seized and did you see anything that was interesting?

4        THE COURT:  Can I just ask one question?  Where was

5  Mr. Keane?  I have the -- two of them, but they don't say where he

6  was served.

7        THE WITNESS:  Not on the service of process, but on the

8  venue enforcement form.  There are two pages for each individual.

9        THE COURT:  Okay.  It just has his home address in

10  New York.  It doesn't say where he was served down here, other than,

11  I guess, the Sun Life Stadium?

12        THE WITNESS:  Yes.

13        MR. MORTON:  You're right, it says New York, and then if

14  you look at the second packet, he's also served at the Raw event,

15  and there's a different address for Mr. Keane.

16        THE COURT:  He gave a different address at the Raw event?

17        THE WITNESS:  That's correct.

18        MR. MORTON:  Correct.

19        THE COURT:  Northport, Florida, is the address at the Raw

20  event.

21        MR. MORTON:  Correct.

22        **BY MR. MORTON:**

23  Q.   Does the fact that he gives multiple addresses give pause to

24  whether or not either of those are correct?

25  A.   I was actually just going to say that.  We don't know if either

1  one is a legitimate address or his legitimate address.

2          THE COURT:  It's interesting to note that Mr. Ingram, who

3  is also one of the individuals served, lists an address of

4  Northport, Florida, as well, but a different street than Mr. Keane.

5          THE WITNESS:  Exactly.

6          THE COURT:  Have you done any kind of analysis to check to

7  see whether or not these are legitimate addresses?

8          THE WITNESS:  We haven't had time, Your Honor.

9          THE COURT:  Okay.

10 Q.    And did you notice where addresses were for other of the

11 defendants involved?  I think we have that --

12 A.    I have, actually, a list of all of the cities and states that

13 they were claiming to live in, whether they do or not.  It's

14 Gardena -- If you'd like, I could just quickly tell you.  Gardena,

15 California; Los Angeles, California; again Gardena, California;

16 Pasadena, California; Apple Valley, California; Santa Monica,

17 California; Davenport, Florida; Poughkeepsie, New York; Pembroke

18 Pines, Florida; again Pasadena; Apple Valley; Kissimmee, Florida;

19 Hollywood, Florida; Northport; and Ridgewood, New York, were all the

20 different locations that either are legitimate addresses or fake

21 IDs.  We don't know.

22 Q.    And while it's hard to determine whether or not these are fake

23 addresses, with regard to the shirts, was there anything that was

24 interesting that you saw that led you to believe that these shirts

25 may have come from or been used before?

1  A.   Absolutely.  If you turn to the following page -- Pardon me and

2  forgive me for not having put page numbers on the PowerPoint -- but

3  it's right after the photo of Sun Life Stadium, and it is entitled,

4  "Example of Countershirts (sic) Found."  That shirt, which we can

5  actually show you, was one of the shirts we came in with, before the

6  WrestleMania events, that had been seized in Fresno, California, at

7  an event there.  And it is the same identical shirt, front and back,

8  that was the most common shirt found during our events here.  So,

9  it's following us around.

10      And as you can see on the back of that shirt, it says "WWE

11  2012," and lists locations where we're going to be.  So, clearly,

12  it's proving that not only have they already followed us from

13  California here, but they will continue to follow us as the events

14  continue.

15  Q.   And do we have some of those shirts here with us today?

16  A.   We do.  We have the shirt that we brought in earlier from

17  Fresno, as well as one example of the shirt that was seized this

18  weekend.

19          MR. MORTON:  Your Honor, may it please the Court, may I

20  approach the witness with a box with the shirts so she can show you

21  some of those shirts?

22          THE COURT:  Yes.

23          THE WITNESS:  Your Honor, I don't know if you want me to

24  hand them to you or to somebody else to give to you?

25          THE COURT:  Just hold them up.

1        THE WITNESS:  This is the one that we brought in originally

2  from Fresno.

3        THE COURT:  That's the one from Fresno.

4        THE WITNESS:  Correct.  Before the WrestleMania events this

5  weekend.

6        And this is an example from one of the bags.  Same shirt,

7  same design, a little poorly made, as you can see on the bottom.

8        THE COURT:  Yes.  It's sort of cut off.

9        THE WITNESS:  Exactly.

10        THE COURT:  And that's a child's shirt.

11        THE WITNESS:  That was my next point.  Most of the shirts

12  we found were children's size.  This particular one, from the cut

13  label, says "youth," and I believe it's a size 5.  So, for a child

14  who's five.  So, most of the shirts that were being sold were geared

15  towards to be worn by children.

16        THE COURT:  What were they selling them for?  Did you find

17  that out?

18        THE WITNESS:  I know this one individual was selling it for

19  $10.  I don't know what the other prices were.  They typically range

20  between 10 and 20.  The original shirt -- Well, this isn't even a

21  copy of the original.  The original is a completely different

22  design, legitimate product.  We sell it for 30.

23        **BY MR. MORTON:**

24  Q.   As we're going through that, do many of the folks who we seize

25  shirts from -- were the shirts they were selling similar to each

1   other?

2   A.   They were completely similar to each other in both design,

3   sometimes the labels were similar to each other, even though the

4   individuals came from completely different states by themselves and

5   not even from Florida.

6        This has the same front as the other shirt that I just showed

7   you, but a different back.  It doesn't have the 12 with the dates.

8   It actually has the same image as the front, just in black and

9   white.

10       THE COURT:  Okay.

11  A.   But what's important about this image that they all seem to be

12  using, this isn't an image that is on any product that we have right

13  now.  And I'll go into it a little later.

14       But this individual up here (pointing), the blond, his name is

15  Brock Lesnar.  He hasn't been with WWE for many years.  He just

16  recently re-signed, but this shirt, seized in Fresno, with this

17  design, was well before he was signed back with WWE.  So, this isn't

18  a current image available on our website of anything.  So, it's more

19  than a coincidence that so many people are using this same image.

20       And if you notice --

21       THE COURT:  The individual that you pointed out of Brock

22  Lesnar -- that's B-R-O-C-K, Mr. Ehrlich, and last name

23  L-E-S-N-A-R -- as you look at the image, he is the blond on the

24  right in the back row.

25       MR. MORTON:  That's correct.

1 A.   And if you notice, that's already kind of coming apart, the

2 shirt, on the side.

3     This is another version of the same shirt with the same design

4 front and back.

5          THE COURT:  And this one has the listing of the cities.

6          THE WITNESS:  That's correct.

7 A.   And that shirt was seized from people with IDs from Pasadena,

8 California; Los Angeles, California; Gardena, California; Apple

9 Valley, California; Santa Monica, California; and Poughkeepsie,

10 New York.

11     This particular shirt is a different design.  This was seized

12 at WrestleMania from someone from Davenport, Florida.  And it's just

13 a logo in the front and more ink on the back.

14 Q.   And when you received those shirts -- the Court is a little far

15 away -- was there a smell to a lot of those shirts?

16 A.   I was just going to show you.  If I might hand it to you.

17 There's a -- (handing to the Court) -- a distinct chemical odor.

18          THE COURT:  Have you had that analyzed as to how it was

19 applied?

20          THE WITNESS:  We haven't had the opportunity, no.

21          THE COURT:  But it's very strong.

22          THE WITNESS:  Yes.  And that's been outside of the bag for

23 a few days.

24          THE COURT:  This is the one that is different from the

25 others, and on the back has the date of April 1, 2012.

1          THE WITNESS:  Right.

2  A.    And then this is another shirt that was seized from a woman who

3  claims to live in Florida.

4          THE COURT:  So, you actually had women peddling these as

5  well.

6          THE WITNESS:  This is the first time that we've seen a

7  woman, yes.

8  A.    This one also has a distinct pleasant odor.

9        And this is --

10         MR. MORTON:  Just for the record, the "pleasant" was a

11 sarcasm.

12 A.    Absolutely.

13       This is The Rock.  I don't know if you know him.  He's one of

14 our biggest talent right now.  He's also in mainstream movies.  He

15 was one of the headline events at WrestleMania.  And so, this was

16 one of the shirts that was being sold with his -- our intellectual

17 property with his name on it.

18         THE WITNESS:  If you want to smell this, it also has an

19 unpleasant odor.  (Handing to the Court.)

20         THE COURT:  I don't even have to have it close to my nose.

21        This one, instead of a T-shirt, is sort of like --

22         THE WITNESS:  A football jersey.

23         THE COURT:  -- a football jersey.

24         THE WITNESS:  Right.

25         **BY MR. MORTON:**

1  Q.    And did The Rock play football?

2  A.    Yes, he did.

3  Q.    And where did he play football?

4  A.    I believe it was in Canada.  In fact, at last night's Raw

5  event, he made a joke about how he was kicked off the Canadian

6  football team.

7         THE COURT:  So, she was the only dispenser of those shirts,

8  that you were able to seize five from her?

9         THE WITNESS:  Five of one color, 13 of the other color.

10 It's the same shirt, just a different color.  An even worse odor.

11        THE COURT:  I'll take your word for it.

12        THE WITNESS:  The plastic is hard and does not even bend

13 easily.  I don't know what it would do to a washing machine or

14 somebody who wore it.

15        THE COURT:  So, the five were with the red, and the 13 were

16 sort of the cobalt blue.

17        THE WITNESS:  Correct.

18 A.    This is another shirt from an individual claiming to be from

19 Pasadena, California.

20        Another child size shirt.  Same logo as you saw before, not a

21 logo we were using on our shirts.  Nothing on the back this time.

22        What's interesting about this shirt is in the neck label,

23 they've actually gone so far as to copy our authentic neck labels,

24 but what they didn't realize is the Zappar, Z-A-P-P-A-R, that

25 appears underneath, the legitimate shirt that has this neck label is

1  what's called a "virtual reality shirt," which means when you take

2  your iPhone, or any kind of cell phone, if you download the app for

3  the shirt from the Zappar company, aim it at the shirt, you can

4  watch video on your iPhone that is based on this shirt.  It's

5  relatively new, and it's something that's very creative and

6  otherwise a great shirt, but they didn't realize that that's what

7  that shirt was for.  And all they did was merely copy the neck

8  label.  And this is not one of those shirts.  It does not activate

9  the application.  And, again, aimed at a child.

10      This shirt, again, was seized from the same individual that

11  made that shirt, claiming to be from Pasadena.  Another child's

12  version of the shirt.  They Have the same cut-off dates.

13          THE COURT:  On the back?

14          THE WITNESS:  I don't know if you want me to show you all

15  the shirts.  I'm happy to do so.

16          THE COURT:  The rest are the same as the first ones?  Are

17  there any other different ones?

18          THE WITNESS:  This one is different.

19          **BY MR. MORTON:**

20  Q.   And to be clear, were you seeing similar shirts from multiple

21  of the folks who we seized shirts from?

22  A.   Absolutely, yeah.  From -- All the shirts that we seized at

23  Axxess, for example, they were all the same.  They were all that

24  original shirt.  And all of them were from different areas, and they

25  weren't standing together or working together.  We don't know if

1  they know each other or how they know each other.  I'm sure they do.

2  But they were all selling the exact same shirt.  Again, images that

3  we don't have up on our website are not out there, and no reason to

4  otherwise use those images.

5  Q.   At least some of those shirts you've seen at other venues?

6  A.   Particularly at Fresno, California, before WrestleMania, that

7  same shirt was there.

8        THE COURT:  And the other ones, the jerseys and the

9  different child shirt that just has "WrestleMania 2012" with nothing

10  on the back, did you see that image at any other time over the

11  weekend?

12        THE WITNESS:  We did see that one from other -- I think it

13  was one other seller.  Nothing on the back.  It was just a few that

14  he had of those particular ones, because the larger sellers were the

15  other original shirt.

16        THE COURT:  And the two jerseys with -- and the foul

17  smelling ones, did you see any similar -- or any other sellers,

18  other than the two that you spotted, the lady and -- Was the lady

19  the only one selling the jerseys?

20        THE WITNESS:  That's correct, yes.

21        THE COURT:  Did you see anyone else selling jerseys or --

22        THE WITNESS:  No, I did not.

23  A.   Here's another style of shirt that was being sold.  This was

24  one of those drop and runs.  It's just WrestleMania branded.  That's

25  the front and this is the back.

1    And this is the same shirt, but a different color.

2    And if you notice, the image on the back is actually --

3         THE COURT:  How are they different in color?

4         THE WITNESS:  This is black, that one is blue.  Not that I

5 want to put these on me.

6         THE COURT:  One is Navy blue and the other is black.

7         THE WITNESS:  Yes.

8         THE COURT:  Okay.

9         **BY MR. MORTON:**

10 Q.   As you're going through the shirts that were seized, where were

11 a lot of them aimed?  Were a lot of them aimed at children, adults?

12 A.   Most of them were children.  And according to the undercover

13 officers who were working for us, they said that's very common,

14 because the kids will see them.  They'll be the ones to bug their

15 parents to get them, and those are the ones that they hope will be

16 bought.  And they are.

17    And each shirt that I'm showing you, by the way, is from a

18 different person.  It's not all the same people.  But, again, same

19 design.

20    And these were actually from earlier, when we came in before.

21    So, those are samples of the different designs that we found

22 throughout the weekend.

23 Q.   And if you go to the very last page of your PowerPoint -- the

24 other pages were of the shirts -- you have something called "Points

25 to Remember."  I just want to ask you about those.

1      Tell me about the first point.

2  A.   As we discussed, most of these shirts bore the same design, the

3  same image, and these are not images that are currently available,

4  these are not images that would otherwise be obviously used by fans

5  who are following story line.  So, there has to be more than a

6  coincidence that people from different locations are selling the

7  exact shirt, front and back.  And we're finding them not in just one

8  location, but in other locations at our live events.

9      And that's the key here.  We need to be able to seize these

10 shirts at our live events.  They're specific events, at specific

11 locations.  And this is designated to seize individual --

12 counterfeit merchandise from those individuals selling at our live

13 events at specific locations.  It's a very specific remedy that we

14 need, because these are the people that are following us around.

15 We're not seeking them out.  They are coming to us and following us.

16 Q.   And when you say "following" --

17      MR. MORTON:  If I could approach the witness with an

18 exhibit, Your Honor?

19      THE COURT:  Yes.

20      (Document handed to witness.)

21 Q.   What is the document I just handed you?

22 A.   This document is a schedule of our live events, starting from

23 March, 2012, and up to and including March, 2013.  We have booked

24 these venues for our live events between now and then, and with only

25 minor exceptions would these change.

1     So, we have scheduled live events at all of these locations.

2  So, we have specific knowledge of where we will be, as do our fans,

3  and as do the bootleggers, because it's on our website, the

4  information is publicized, because we want the fans to go and buy

5  the tickets.  But this is common knowledge, it's out there, and

6  that's how the bootleggers know how to follow us, and they know

7  where we'll be.

8  Q.    Starting next week, can you just kind of take the Court

9  through -- I know some are bold and some are not -- just talk us

10 through what is -- What are these events?

11 A.    Well, for example, the end of March, as you know, was the

12 WrestleMania events that we were here for.

13     Last night, on April 2nd, was our Raw TV, which is one of our

14 regular weekly scheduled programs, but it's live, taped live in

15 front of a live audience and aired live.

16     Tuesday is our SmackDown TV, which is another show.  It is

17 taped in front of a live audience.  It airs on Wednesday.  But,

18 again, it has a live audience.  So, it's people coming to the venue.

19     All of these events listed in these calendars are a venue, a

20 live audience, fans coming to the events.  And you can go on our

21 website, and you can buy tickets to these events.  They are

22 obviously publicized, because we want people to buy tickets.  And,

23 again, as I said, that's how the fans know where to go, and that's

24 also how the bootleggers know where to go.  Specific locations,

25 specific dates, specific times.

1  Q.    In your past experience, have bootleggers shown up to these

2  events?

3  A.    Absolutely.  I am shipped counterfeit merchandise on a daily

4  basis, because we've gotten orders in the past, and that's the only

5  way we can get this counterfeit merchandise off the streets.  And

6  when our security personnel, off-duty officers seize it, they send

7  it back to us.  And each event, I get a box sent to me of the

8  merchandise that was seized then.  And if we are powerless to seize

9  it, we can't stop it from being sold to kids.

10        And we were discussing earlier the cost prohibitive nature of

11 these, and that's one of the points that we're going to make.  But

12 with all due deference to our litigation counsel, it costs WWE about

13 $80,000 a year to get these orders.  And we certainly do not seize

14 $80,000 worth of counterfeit product.  So, that's not our main goal

15 because it's going to offset financial money for us.  It's not going

16 to make us money.  If you do the analysis from a fiscal perspective,

17 it's really not worth it.

18        So, there's another goal for us.  The goal is to get this

19 product off the streets.  We don't know what it's made of.  We don't

20 know what the ink has in it.  We don't know the chemicals that are

21 causing the odor to last three days later is still in the air that

22 you can smell it a foot away.  We don't know what these are made of.

23 But we know they're not safe.  We know they're sub quality.  I don't

24 know what they'll do to a washing machine, how it will affect other

25 clothes.  I don't know if it will cause skin conditions.  They're

1  geared towards children.  And if we can't take it off the street,

2  we're powerless.

3      And it's not because of the money that we want to take it off

4  the street.  We're still selling our legitimate product, although

5  this does harm our reputation as a company if someone doesn't

6  realize that it's not genuine product.  They might think they're

7  getting subpar quality from WWE, and the next time they go to an

8  event, they won't buy it.  It does hurt our reputation.  But that's

9  one fact.  The other fact is the public safety concern.  We're not

10 seizing $80,000 worth of product, but we do it every year for that

11 reason.  And if we don't get an order, the bootleggers win.  We

12 can't seize it.

13 Q.   And it's your experience -- Is it your belief that the

14 bootleggers travel with the show?

15 A.   Absolutely travel with the show.  They know where we'll be.

16 They sometimes know our enforcement personnel.

17         THE COURT:  How do you know that?

18         THE WITNESS:  One of our off-duty officers told me that

19 when he approached one of them, they knew his name.  They had heard

20 of him, because they know that he works for enforcement.  And they

21 are not worried.

22         THE COURT:  Who is that individual?  Who is the enforcement

23 officer?

24         THE WITNESS:  John Caruthers.  He is the one who comes to

25 most of our live events, trains the local off-duty officers on the

1   procedure on how to serve under the order.  And he goes to most of

2   our live events.  And he's very well known.  He's been working for

3   us for many years.  That's who we used in Miami as well.

4   Q.    And in your experience with WWE, has any of these bootleggers

5   ever shown up in court or otherwise protested a seizure order?

6   A.    Not a single time.

7        We would hope that they would, because then we would have the

8   opportunity to question them and to really get at the source.  They

9   never have, because they don't want to submit to that, because they

10  don't want to give us that information.  Their business will be

11  gone, and they won't be able to then still sell at our events.  We

12  would hope that they would.

13       And as our esteemed colleagues said, we would, if at all

14  possible, move it to their location, wherever they actually do live,

15  if that ever came up.  If we were able to do that, we would do that,

16  because we do want to find out the source of these products.

17       They're not coming from overseas.  We file our trademark

18  registrations with Customs in all countries, including the United

19  States.  We get notifications of counterfeit product coming in.  We

20  act quickly with Customs.  It's seized.  We investigate by tracking

21  number what manufacturer it's coming from, what licensee, and we

22  determine quickly, within a day or two, whether it's product that's

23  legitimate or counterfeit.  So, we know what's coming in the borders

24  when seized by Customs.  This is homegrown.  This is something we

25  can't trace.  We can't get back to the source.  So, it's kind of a

1  whack-a-mole method --

2          THE COURT:  It's kind of a what kind of method?

3          THE WITNESS:  Whack-a-mole -- sorry.  It's a carnival game

4  where the little heads pop up, and you have to hit them with a

5  mallet.  And the object is to not let any one pop up.

6  A.    So, this is very much like that, in the sense that because they

7  don't show up, we can't get to the source.  So, the only remedy that

8  is available to us is to hit them as they show up.  And hitting them

9  doesn't mean scare them away with police presence, because then

10  they'll just go underground where we can't find them.  It means

11  seizing the merchandise, A, in the hopes that one day one person

12  will show up, and we can get to the source, or, B, that they stop

13  selling because they realize they're not going to make money,

14  because we're going to seize it.

15          THE COURT:  And how long have you been with WrestleMania

16  now?

17          THE WITNESS:  With World Wrestling Entertainment, I've been

18  with them almost 11 years.

19          THE COURT:  Okay.  And how long as the corporate vice

20  president for intellectual properties?

21          THE WITNESS:  About three years, but I have always been a

22  part of the intellectual property department.  I'm the person who's

23  in charge of all of the trademarks worldwide, as well as all the

24  license agreements, as well as all the approvals for our venue and

25  licensed product.  So, I know the designs we're making; I search

1  them for availability and clear them and file for them.  I'm the one

2  who has been in charge for 11 years of the intellectual property

3  portfolio.

4          THE COURT:  Okay.

5          You all are wearing me down.

6          THE WITNESS:  I hope we're just convincing you of the

7  danger that's out there and the only remedy that we have.

8          THE COURT:  I see the problem.  The issue -- and I'm going

9  to give this back to you, Mr. Morton -- is how do I fashion an order

10  that is consistent with the statute.

11          Do you have any other questions of this witness?

12          MR. MORTON:  No, no, Your Honor.  Thank you very much.

13          THE COURT:  Okay.

14          Just thinking through the logistics here, the parties have

15  established a need for an injunction, and that it needs to be

16  nationwide, and given the unique set of circumstances here, the fact

17  that there is a published route, that it's published on a website,

18  so it's available to everyone, that there appears to be a cadre of

19  camp followers, including the same person at the past that have been

20  served with injunctions, but this has not stopped them, and that

21  they are primarily selling merchandise that is aimed towards

22  children, and based on the evidence presented here, product that is

23  obviously of great concern as to the quality and the safety of the

24  dyes, I can see how you need it to be nationwide.

25          The question that I have is right now -- the two initial

1 questions are:  How do I draft the order so that it is consistent

2 with the provisions of the act, which I can't ignore?  I mean that's

3 not an option.  And then the second thing is:  How do I ensure that

4 if someone does show up, how does that -- or seek to contest, how

5 does that person come back to me to do that, because this is the

6 jurisdiction in which it was issued?

7 　　　　MR. MORTON:  Well, as to your last --

8 　　　　THE COURT:  And I'm going to give this back to you and

9 suggest that you think about it and let me know by this afternoon

10 how -- and come up with a proposed draft order, because it needs --

11 Let's face it, what you need is something that is easy to read, easy

12 to enforce, because if you get -- somebody raises an issue in

13 another jurisdiction, you want that new judge to have access to this

14 file and all of the evidence that you have presented here in this

15 case.  So, to a certain extent, I'd like for you to put together

16 affidavits that attach these proofs of service and venue enforcement

17 reports so that it is filed in this court record.

18 　　　　I'd also like for you to attach, either as an affidavit or

19 just simply a notice of filing, of what is in the PowerPoint,

20 because here, particularly with a trademark or Lanham Act

21 infringement, a picture is worth a thousand words, and the devil is

22 in the details.

23 　　　　But I'm persuaded that you do need to have a nationwide

24 seizure order.  But if I'm going to be the first one that really

25 does one -- I know that you've given me one before, but I looked at

1  the one that was out of Boston that Judge Gertner signed, and it was

2  obviously a form order that she just sort of signed.  And I don't

3  want this to be a law treatise.  But let's face it, you all are

4  interested in having something that stands up.

5          MR. MORTON:  We'll do that, Your Honor.

6          THE COURT:  Is there anything else that we need?

7          MR. MORTON:  No, Your Honor.  Thank you very much.

8          THE COURT:  I thank you very much for the education.  Let

9  me give you back all of these items.

10         And if you can, just give me -- I don't know how you're

11 going to do this so quickly -- It's the Kentucky case, isn't it,

12 that you're relying on?  It has the initials, the 233 F.Supp.2d 849.

13 What's the name of the case?

14         MR. MORTON:  SKS Merchandise.

15         THE COURT:  That's out of Kentucky, correct?

16         MR. MORTON:  Correct.

17         THE COURT:  I can remember all of the other details except

18 for the names.

19         I will be happy to enter the preliminary injunction,

20 because I think that you've met all of the criteria for showing a

21 strong likelihood of success on the merits, and that if I don't

22 enter the injunction, the safety of the public is at jeopardy, to

23 say nothing of what other recourse do you have to protect your

24 trademark.  Okay?

25         THE WITNESS:  Thank you, Your Honor.

1          MR. MORTON:  Thank you, Your Honor.

2          THE COURT:  How are we going to do this so that it's short

3   and easy?  You need to think through the mechanics so we can deal

4   with the provisions under subparagraph 5 of 1116(d).

5          MR. MORTON:  Okay, Your Honor.  You want it this afternoon,

6   you said?

7          THE COURT:  If you can get it.  Or -- When is your next

8   event?  It's tomorrow.

9          THE WITNESS:  Tonight.  It's tonight in Orlando.

10         THE COURT:  Okay.

11         MR. MORTON:  We'll get it to you as soon as we can, Your

12  Honor.

13         THE COURT:  Okay.  I'd rather it be good.

14         MR. MORTON:  I understand that.

15          If you want us to add in the facts we talked about today,

16  we'll -- We started doing that.  We'll -- As you know, it's a

17  moving -- We're trying to get as much as we can --

18         THE COURT:  I recognize that the fire is out there.  But we

19  have to cross the T's and dot the I's.

20         MR. MORTON:  I understand.  And just as a logistical

21  practical, are we now back to e-filing, or are we still --

22         THE COURT:  Now that I've unsealed, you can e-file.  You

23  don't have to submit anything.

24         MR. MORTON:  Okay.

25         THE WITNESS:  The current order is in place, I think, until

1  midnight tonight, correct?

2          MR. MORTON:  Correct.

3          THE WITNESS:  I think we would be covered still for

4  tonight.  I don't know if that --

5          THE COURT:  But the current order did not cover Orlando.

6          MR. MORTON:  Right.

7          THE WITNESS:  I'm sorry.  Yes.

8          THE COURT:  The current order was just here for Miami.

9          THE WITNESS:  That's correct, Your Honor.  Thank you.

10         THE COURT:  You have persuaded me, though, as to the need.

11 And you've really turned me around with your evidence.

12         MR. MORTON:  Thank you, Your Honor.

13         THE COURT:  Okay.

14         THE WITNESS:  Thank you.

15         THE COURT:  You make a good witness, too.

16         THE WITNESS:  Thank you.

17         THE COURT:  Do you need your Vuitton vs. White case back?

18 Let me give this back to you so you have your copy.

19         Louis Vuitton is very, very proactive in protecting its

20 mark.

21         MR. MORTON:  Yes.

22         THE WITNESS:  I'm actually good friends with their

23 enforcement counsel.  So, I agree with you, they are.

24

25

1        THE COURT:  But I can imagine --

2        We're off the record, Mr. Ehrlich.  We're finished.

3        (Off-the-record discussion.)

4

5                    **<u>CERTIFICATION</u>**

6

7  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

8  OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

9  June 4, 2012                    S/DAVID S. EHRLICH
                                   Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2

# World Wrestling Entertainment

# WrestleMania Events
# 2012
# Enforcement Results

# WRESTLEMANIA 2012 – 78,363 attendees
## (Sun Life Stadium's largest attended event in history)



# There was an extremely large police presence at all events:

 

 

Ex. 2 to Middlen Declaration                                                                                        Ex. 1 to Memorandum

# And on the roads leading to the events as well:






Ex. 2 to Middlen Declaration                                              Ex. 1 to Memorandum

# **Counterfeiters were found selling bootleg merchandise**

## WrestleMania Axxess venue

## Fan Parking Lot



## Bootleggers were selling here



**I was able to take a a photo of one counterfeiter selling shirts on the path leading from one fan parking lot to WrestleMania at Sun Life Stadium…**



**Counterfeit shirts were also being sold in the parking lots and areas outside the stadium…**

# Example of counterfeit shirts found*

 

*Front of shirt*                    *Back of shirt*

**\* This design, which is <u>not</u> WrestleMania-branded, shows the intent of the counterfeiters to sell counterfeit shirts at WWE around at all of our events…**

(this is the shirt from the previous slide)…

 

**<u>This identical shirt design (front & back) was being sold this weekend by counterfeiters from the following locations:</u>**

- **Pasadena, *California***
- **Los Angeles, *California***
- **Gardena, *California***
- **Apple Valley, *California***
- **Santa Monica, *California***
- **Poughkeepsie, *New York***

**We've also seen this identical shirt sold at previous WWE events by other counterfeiters residing in <u>other locations</u>.  The design contains the image of Brock Lesnar, who has not been with WWE for many years.**

# <u>Other shirt designs seized this weekend</u>:





Front                                    Back

*Seized from individual from Santa Monica, California*

# <u>Other shirt designs seized this weekend</u>:





Front                                        Back

*Seized from individual from Davenport, Florida*

# Other shirt designs seized this weekend:



#1 Front



#1 Back

*Seized from individual from Pembroke Pines, Florida*



#2 Front



#2 Back

# Other shirt designs seized this weekend:



Front



Back

*Seized from individual from Pasadena, California (counterfeiter copied our specialized neck label)*

# Other shirt designs seized this weekend:





Front                                              Back

*Seized from individual – "drop & run" – no ID*

# TOTAL NUMBER OF COUNTERFEIT SEIZED DURING WRESTLEMANIA EVENTS (not including Raw on 4/2/12)

## 265 counterfeit shirts



## <u>Points to Remember</u>:

1.  Most of the shirts seized were the <u>identical</u> design, even though the counterfeiters came from different locations/states

2.  The most common design found contained an image of a wrestler who has not been with WWE for many years – not a current image.

3.  **MOST OF THE SHIRTS WERE CHILDREN SIZED – to be sold to, and worn by, children.  Therefore, the greatest risk was to our nation's children who travel from all over to come to our events nationwide.**

# EXHIBIT 3

# BEFORE WRESTLEMANIA EVENTS:

In the middle of March 2013, we encountered the following shirts during our live events in Pittsburgh, PA and Cincinnati, OH:



(Front of shirt)



(Back of shirt)

This shirt was also being sold in New Jersey  during the WrestleMania Events.

# BEFORE WRESTLEMANIA EVENTS:

On Sunday, March 31, 2013, we encountered the following shirts during our live event in White Plains, NY:



(Front of shirt)



(Back of shirt)

# <u>DURING WRESTLEMANIA EVENTS</u>:

<u>#1: Seized from Herbert Reid, from Schenectady, NY (he was served)</u>:



(Front of shirt)



(Back of shirt)

## 60 Shirts Seized

# DURING WRESTLEMANIA EVENTS:

<u>#3: Seized from John Doe (he was served):</u>



(Front of shirt)



(Back of shirt)

## 5 Shirts Seized

# DURING WRESTLEMANIA EVENTS:

#5: Seized from Byron Douglas, from Brooklyn, NY (he was served):



(Front of shirt)



(Back of shirt)

**3 Shirts Seized**

# DURING WRESTLEMANIA EVENTS:

## Seized from many different John Does (would not accept service):



(Front of shirt)



(Back of shirt)

<span style="color:red">**Approx. 190 Shirts Seized**</span>

Ex. 3 to Middlen Declaration

Ex. 1 to Memorandum

# <u>DURING WRESTLEMANIA EVENTS:</u>

## Seized from many different John Does (would not accept service):



(Front of shirt)



(Back of shirt)

**Approx. 30 Shirts Seized**

# DURING WRESTLEMANIA EVENTS:

<u>#2: Seized from John Doe (he was served):</u>





(Front of shirt)                    (Back of shirt)

**4 Shirts Seized**

# DURING WRESTLEMANIA EVENTS:

#4: Seized from John Doe (he was served):

 

(Front of shirt)                    (Back of shirt)

**6 Shirts Seized**

# <u>DURING WRESTLEMANIA EVENTS (at Raw on 4/8/13)</u>:

<u>#7: Seized from Christopher Huff (he was served)</u>:





(Front of shirt)                          (Back of shirt)

## 20 Shirts Seized

# **<u>DURING WRESTLEMANIA EVENTS (at Raw on 4/8/13)</u>:**

<u>#8: Seized from Scott Dreger, from Springfield, PA (he was served)</u>:



(Front of shirt)



(Back of shirt)

**21 Shirts Seized**

# DURING WRESTLEMANIA EVENTS:

## Seized from many different John Does (would not accept service):



(Front of shirt)



(Back of shirt)

<div style="border: 2px solid black; text-align: center; color: red; font-weight: bold;">Approx. 40 Shirts Seized</div>

# <u>DURING WRESTLEMANIA EVENTS:</u>

## Seized from many different John Does (would not accept service):



(Front of shirt)



(Back of shirt)

## Approx. 15 Shirts Seized

# <u>DURING WRESTLEMANIA EVENTS:</u>

## Seized from many different John Does (would not accept service):



(Front of shirt)



(Back of shirt)

**Approx. 50 Shirts Seized**

# <u>DURING WRESTLEMANIA EVENTS:</u>

<u>#6: Seized from Victor William Pritchard, from Orange, CA (he was served):</u>

 



## 28 Poster Boards Seized

# DURING WRESTLEMANIA EVENTS:

#9: Seized from William S. Brown, from Middletown, CT (he was served):







**103 DVD Sets Seized
(2,042 Discs Seized)**

# DURING WRESTLEMANIA EVENTS:

#10: Seized from Kenneth Asal, from East Berlin, CT (he was served):





**11 Action Figures Seized**



# WRESTLEMANIA EVENTS SEIZURE TOTALS

| **Description** | **# Seized** | **Value** |
| --- | --- | --- |
| Shirts | 440 ($20 each) | $8,800.00 |
| Poster Boards | 28 ($25 each) | $700.00 |
| Action Figures | 11 ($30 each) | $350.00 |
| DVDs | 103 DVD Sets = 2,042 DVDs | Value of $52,000.00 |

**2,491 units**

# EXHIBIT 4

## VENUE ENFORCEMENT REPORT

Date of Event: ___3-28-15___

Event Venue: ___SAP CENTER___

Name of Defendant Served: ___Benjamin Adham Pechetti___

Address of Defendant Served:

___1284 ODDSTAD DRIVE___

___Redwood City, CA 94063___

Time Defendant Served: ___1520 hrs___

Type of Merchandise Seized: ___Cardboard Photo's___

Quantity of Merchandise Seized: ___18___

Approx. Height of Defendant: ___6'1___

Approx. Weight of Defendant: ___220___

Ethnicity of Defendant: ___W/M___

Law enforcement involvement: ___Homeland Security Investigation (HSI)___

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 15-cv-01263-VC

<div align="center">

**PROOF OF SERVICE**
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

</div>

This summons for *(name of individual and title, if any)* _Benjamin Adham Pechetti_

was received by me on *(date)* _3-28-15_

☒ I personally served the summons on the individual at *(place)* _SAP CENTER_ _on_

_autumn St._ _____ on *(date)* _3-28-15_ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ _0.00_ ʻ

I declare under penalty of perjury that this information is true.

Date: _3-28-15_

_____
*Server's signature*

_Todd Schoenberger_
*Printed name and title*

_200 S. First St., Ste 170_
_San Jose, CA 95113_
*Server's address*

Additional information regarding attempted service, etc:

## VENUE ENFORCEMENT REPORT

Date of Event: 3/21/2015

Event Venue: Levi's Stadium

Name of Defendant Served: Ibraham Nimer Shiheiber

Address of Defendant Served:

847 Skyline

Daly City, CA 94132

Time Defendant Served: 13:40

Type of Merchandise Seized: Flags / Towels

Quantity of Merchandise Seized: 62

Approx. Height of Defendant: 5'7"

Approx. Weight of Defendant: 160 lbs.

Ethnicity of Defendant: W

Law enforcement involvement: HSI Seizure

PI-2136650 v1

Ex. 4 to Middlen Declaration

Ex. 1 to Memorandum

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 15-cv-01263-VC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* Ibrahim Nimer Shiheiber

was received by me on *(date)* 3/28/2015

☒ I personally served the summons on the individual at *(place)* Levi's Stadium,
Green Lot 1 (4949 Marie DeBartolo Way, Santa Clara, CA 95050) on *(date)* 3/29/2015 ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00

I declare under penalty of perjury that this information is true.


Date: 3/29/15 _____

_____
*Server's signature*

Todd Schoenberger
*Printed name and title*

280 S. First St.
Suite 190
San Jose, CA 95113
*Server's address*

Additional information regarding attempted service, etc:

## VENUE ENFORCEMENT REPORT

Date of Event: ___3-28-15___

Event Venue: ___SAP CENTER___

Name of Defendant Served: ___Dominic Angel Rodriguez___

Address of Defendant Served:

___3015 E. Bayshore Rd., Spc. 202___

___Redwood City, CA 94063___

Time Defendant Served: ___8:20 pm___

Type of Merchandise Seized: ___"Fat Heads"___

Quantity of Merchandise Seized: ___2___

Approx. Height of Defendant: ___5'7"___

Approx. Weight of Defendant: ___176 lbs___

Ethnicity of Defendant: ___W___

Law enforcement involvement: ___HSI Seizure___

PI-2136650 v1

Ex. 4 to Middlen Declaration                                   Ex. 1 to Memorandum

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 15-cv-01263-VC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* Dominic Angel Rodriguez

was received by me on *(date)* 3/28/15      .

☒ I personally served the summons on the individual at *(place)* SAP Center on Autumn St.

_____ on *(date)* 3/28/ 15     ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00     .

I declare under penalty of perjury that this information is true.

Date: 3/28/15 _____

_____
*Server's signature*

Todd Schoenberger
*Printed name and title*

280 S. First St., Ste 120
San Jose, CA 95113
*Server's address*

Additional information regarding attempted service, etc:

## VENUE ENFORCEMENT REPORT

Date of Event: _3/28/15_

Event Venue: _S/rP Center_

Name of Defendant Served: _Vu Truong Tran_

Address of Defendant Served:

_80 Glenn Way APT B_

_San Carlos, CA 94070_

Time Defendant Served: _3:20 pm_

Type of Merchandise Seized: _"Fat Heads"_

Quantity of Merchandise Seized: _2 ea_

Approx. Height of Defendant: _5'5"_

Approx. Weight of Defendant: _135 lbs_

Ethnicity of Defendant: _A_

Law enforcement involvement: _HSI Seizure_

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 15-cv-01263-VC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   Vu Truong Tran

was received by me on *(date)*   3/28/15

   ☒ I personally served the summons on the individual at *(place)*   SAP Center on Autumn

           on *(date)*   3/28/15   ; or

   ☐ I left the summons at the individual's residence or usual place of abode with *(name)*

                     , a person of suitable age and discretion who resides there,

on *(date)*           , and mailed a copy to the individual's last known address; or

   ☐ I served the summons on *(name of individual)*              , who is

designated by law to accept service of process on behalf of *(name of organization)*

                    on *(date)*         ; or

   ☐ I returned the summons unexecuted because              ; or

   ☐ Other *(specify)*:

My fees are $       for travel and $       for services, for a total of $   0.00

I declare under penalty of perjury that this information is true.

Date: 3/28/15

                                *Server's signature*

                       Todd Schoenburger
                            *Printed name and title*

                      280 S. First St., Ste 190
                     San Jose, CA 95113
                            *Server's address*

Additional information regarding attempted service, etc:

# EXHIBIT 5

**In February 2015, WWE was contacted by the Department of Homeland Security, San Jose office regarding a store in the a mall in San Jose, CA. The owner of this store was selling a volume of merchandise that DHS believed to be counterfeit, including NFL, MLB, NBA and WWE product. The owner of this store was also working with a third party wrestling promotion that follows WWE shows to sell product nearby. WWE worked with DHS to identify which items were indeed WWE counterfeit product, including the use of our intellectual property on their actual business cards:**



**On Wednesday, March 25th, DHS raided Milo's Collectibles in San Jose, CA (this action was not under WWE's TRO, but rather pursuant to a search warrant obtained by DHS - lots of WWE intellectual property present):**





Ex. 5 to Middlen Declaration

Ex. 1 to Memorandum

**DHS seized more than 60 counterfeit WWE shirts containing the following six designs (selling for $25 each / 2 for $40):**

#1



#2



#3

#4





#5

#6





# DHS also seized more than 15 counterfeit WWE plaques (worth approx. $150 each):



**Additional counterfeit WWE plaques seized:**





# Additional counterfeit WWE plaques seized:





Ex. 5 to Middlen Declaration

Ex. 1 to Memorandum

## Counterfeit WWE nameplates seized:



**The owner of the store admitted to making unauthorized copies of WWE copyrighted photos:**





Ex. 5 to Middlen Declaration

Ex. 1 to Memorandum

# DHS ended up seizing approximately <u>$3800</u> worth of counterfeit WWE product:





DEPARTMENT OF HOMELAND SECURITY

**CUSTODY RECEIPT for
SEIZED PROPERTY and EVIDENCE**

No. 60358 ≥8
04

Handbook 5200-09

| 1. FPF No. 2 0 1 5 2 8 3 4 0 0 0 0 2 7 0 1 | 2. Incident No. 2 0 1 5 S 2 0 0 5 8 1 1 0 0 1 | | |
|---|---|---|---|
| 3. Investigative Case No. S N 0 0 8 N H 1 4 5 N 0 0 0 3 | 4. Enforce No. ☐☐☐☐☐☐☐☐☐☐☐ | | |
| 5. Prior Detention? Yes ☐ No ☐  If yes, DHS 6051D No. | 6. Date Seized (mm/dd/yyyy) 03/25/2015 | 7. Time Seized (Use 24 Hrs) | 8. FDIN/Misc. |
| 9. Seized From: Name: MILO LECA | 10. Entry No. | | 11. Seal or Other ID Nos. |
| Address: 1200 EASTRIDGE LOOP #1408 SAN JOSE CA 95122 Telephone No. 408 532 0706 Ext. | 12. Remarks: | | |
| 13. Send Correspondence to: | | | |

| 14. PROPERTY ( By Line Item) Attach DHS Form 58 if conveyance | | | | | | |
|---|---|---|---|---|---|---|
| a. Line Item No. | b. Description | c. Packages Number | Type | d. Measurements Qty. | UM | e. Est. Dom. Value |
| 1 | Counterfeit WWE T-shirts | | | 37 | ea | $ 1110 |
| 2 | Counterfeit WWE Plaques | | | 9 | | $ 1350 |
| 3 | Counterfeit WWE SHADOW BOXES | | | 3 | | $ 600 |
| 4 | Counterfeit WWE Nameplates | | | 11 | | $ 55 |
| 5 | Business Cards Bearing unauthorized WWE Trademark | | | 11 | | $ 1 |
| 6 | Counterfeit WWE Mini Plaques | | | 8 | | $ 120 |

| 15. Seizing Officer Stebbins   X ____ | | 3/25/15 |
|---|---|---|
| Print Name | Signature | Date |

| 16. ACCEPTANCE / CHAIN OF CUSTODY | | | | |
|---|---|---|---|---|
| a. Line Item No. | b. Description | c. Print Name/Title/Organization | d. Signature | e. Date |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

DHS Form 6051A Continuation Sheet Attached? Yes ☐ No ☐
DHS retains original
Previous editions are obsolete

DHS Form 6051S (08/09)

---

DEPARTMENT OF THE TREASURY
UNITED STATES CUSTOMS SERVICE

6035804

**CUSTODY RECEIPT FOR RETAINED OR SEIZED PROPERTY**
CONTINUATION SHEET

SN08NH14SN0003

CIS Handbook No. HB 5200-09

2015 2834 0000 2701

| 1. PORT 2834 | 2. SEIZURE NO. | 3. GENERAL ORDER NO. | 4. OTHER CONTROL NO. 6035804 | 5. DATE RET./SEIZED |
|---|---|---|---|---|

20. PROPERTY (By Line Item) Attach CF 58 if conveyance.

| a. LINE ITEM NO. | b. DESCRIPTION | c. CONDITION | d. TYPE OF CONTAINER | e. UM | f. QTY | g. APPRAISED DOMESTIC VALUE | h. HELD SEIZED PORT |
|---|---|---|---|---|---|---|---|
| 7 | Wrestlecrafters Bearing unauthorized WWE Trademark | | | ea | 42 | 1 | |
| 8 | Counterfeit NFL Jerseys | | | | 30 | 5,100 | |
| 9 | Counterfeit NFL Ponchos | | | | 8 | 480 | |
| 10 | Counterfeit NBA Jerseys | | | | 18 | 1,800 | |
| 11 | Counterfeit MLB Jerseys | | | | 20 | 3,400 | |
| 12 | Counterfeit NHL Jerseys | | | | 6 | 1,200 | |
| 13 | Counterfeit NHL Sweatshirts | | | | 3 | 150 | |
| 14 | Counterfeit MLB Patches | | | | 33 | 495 | |
| 15 | Counterfeit NFL Patches | | | | 55 | 825 | |
| 16 | Counterfeit NHL Patches | | | | 2 | 30 | |
| 17 | Counterfeit NBA Patches | | | | 1 | 15 | |
| 18 | Counterfeit NFL HATS | | | | 12 | 420 | |
| 19 | Counterfeit MLB HAT | | | | 1 | 35 | |
| 20 | Counterfeit MLB RING | | | | 1 | 40 | |
| 21 | Counterfeit NFL RINGS | | | | 7 | 280 | |
| 22 | Counterfeit NFL Beanies | | | | 20 | 500 | |
| 23 | Counterfeit NBA Beanies | | | | 2 | 50 | |
| 24 | Counterfeit MLB Beanies | | | | 4 | 100 | |
| 25 | Counterfeit NHL Beanies | | | | 10 | 250 | |
| 26 | Wrestlecon Poster Bearing unauthorized WWE Trademark | | | | 1 | 1 | |
| 27 | Counterfeit NFL JERSEYS | | | | 22 | 3,740 | |
| 28 | Counterfeit WWE T-shirts | | | | 19 | 570 | |
| 29 | Counterfeit MLB JERSEYS | | | | 9 | 1,530 | |

Customs Form 6051A (051396)

**On Saturday, March, 28th, while fans lined up to enter the WWE Hall of Fame event, DHS discovered three Bootleggers selling counterfeit WWE cardboard signs to fans as they waited on line:**

**DHS seized this counterfeit product and served the three defendants…**



Ex. 1 to Memorandum





Page 1

Page 2

VENUE ENFORCEMENT REPORT

Date of Event: 3-28-15

Event Venue: SAP CENTER

Name of Defendant Served: Benjamin Adham Pechetti

Address of Defendant Served:

1284 ODDSTAD DRIVE

Redwood City, CA 94063

Time Defendant Served: 1520 hrs

Type of Merchandise Seized: Cardboard Photo's

Quantity of Merchandise Seized: 18

Approx. Height of Defendant: 6'1

Approx. Weight of Defendant: 220

Ethnicity of Defendant: W/M

Law enforcement involvement: Homeland Security Investigation (HSI)

PI-2136650 v1

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 15-cv-01263-VC

PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* Benjamin Adham Pechetti was received by me on *(date)* 3-22-15.

☒ I personally served the summons on the individual at *(place)* SAP CENTER on autumn St. on *(date)* 3-28-15 ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* ________, a person of suitable age and discretion who resides there, on *(date)* ________, and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* ________, who is designated by law to accept service of process on behalf of *(name of organization)* ________ on *(date)* ________ ; or

☐ I returned the summons unexecuted because ________ ; or

☐ Other *(specify)*:

My fees are $ ______ for travel and $ ______ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 3-28-15

[signature]
*Server's signature*

Todd Schoenberger
*Printed name and title*

280 S. First St., Ste 190
San Jose, CA 95113
*Server's address*

Additional information regarding attempted service, etc:

Ex. 5 to Middlen Declaration

Ex. 1 to Memorandum

## VENUE ENFORCEMENT REPORT

Date of Event: ___3-28-15___

Event Venue: ___SAP CENTER___

Name of Defendant Served: ___Dominic Angel Rodriguez___

Address of Defendant Served:

___3015 E. Bayshore Rd, Spc 202___

___Redwood City, CA 94063___

Time Defendant Served: ___3:20 pm___

Type of Merchandise Seized: ___"Fat Heads"___

Quantity of Merchandise Seized: ___2___

Approx. Height of Defendant: ___5'7"___

Approx. Weight of Defendant: ___175 lbs___

Ethnicity of Defendant: ___W___

Law enforcement involvement: ___HB1 Seizure___

PJ-2136650 v1

---

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 15-cv-01263-VC

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* ___Dominic Angel Rodriguez___
was received by me on *(date)* ___3/28/15___ .

☑ I personally served the summons on the individual at *(place)* ___SAP Center on Autumn St.___
_____ on *(date)* ___3/28/15___ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: ___3/28/15___                        _____
                                                        *Server's signature*

                                           Todd Schoenberger
                                                        *Printed name and title*

                                           200 S. First St., Ste 180
                                           San Jose, CA 95113
                                                        *Server's address*

Additional information regarding attempted service, etc:

---

Ex. 5 to Middlen Declaration                              Ex. 1 to Memorandum

**One of the bootleggers we served during the WWE Hall of Fame (selling counterfeit WWE cardboard signs) later thanked us through Instagram for the way in which WWE and DHS conducted the seizure and for the explanations we provided…**



Ex. 5 to Middlen Declaration

Ex. 1 to Memorandum





**notfamous61** 4d
NOT FAMOUS Ⓡ HUSTLE HEAD···Normal

♥ 69  💬 5

♥ @takervip @voodoodopeboyfresh61
@j_bert8 @starcitygraphics

 

**notfamous61 You Just Got Served !**
**Everything went great at the WWE Hall of Fame ! We had a**
**minor issue with Law Enforcement. But thankfully they all**
**Loved HustleHeads !!! SEE YOU GUYS TOMORROW AT**
**#WRESTLEMANIA !!!** 4d

**big_pat_925** Did u take Macho mans out to the shark tank?
@notfamous61 4d

**notfamous61** Yes @big_pat_925 they made me leave and
confiscated a few 4d

**big_pat_925** Aww damn!! Were u at least able to off some
before Johnny law gave u the boot? @notfamous61 4d

**notfamous61** Kinda @big_pat_925 4d

**big_pat_925** Oh ok. I'll see u tomorrow at mania bro!
@notfamous61 4d

» LOG IN to write comment.

**On Sunday, March 29th, while fans were tailgating in the parking lot of Levi Stadium, waiting for WrestleMania 31 to begin, DHS discovered bootleggers selling counterfeit WWE cloth pennants to fans in the parking lots:**

**DHS seized this counterfeit product and served the defendant…**



Ex. 5 to Middlen Declaration



Ex. 1 to Memorandum



## Page 1

**VENUE ENFORCEMENT REPORT**

Date of Event: 3/21/2015

Event Venue: Levi's Stadium

Name of Defendant Served: Ibraham Nimer Shiheiber

Address of Defendant Served:

847 Skyline

Daly City, CA 94133

Time Defendant Served: 18:40

Type of Merchandise Seized: Flags / Towels

Quantity of Merchandise Seized: 62

Approx. Height of Defendant: 5'7"

Approx. Weight of Defendant: 160 lbs.

Ethnicity of Defendant: W

Law enforcement involvement: HSI  Suzuki

PI-2136650 v1

## Page 2

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 15-cv-01263-VC

**PROOF OF SERVICE**
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* Ibraham Nimer Shiheiber
was received by me on *(date)* 3/25/2015 .

☒ I personally served the summons on the individual at *(place)* Levi's Stadium,
Green Lot 1 (4899 Marie De Bartolo Wy) Santa Clara, CA 95050 on *(date)* 3/25/2015 ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*
_____, a person of suitable age and discretion who resides there,
on *(date)* _____, and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____, who is
designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 3/25/15

Todd Schoenberger
*Printed name and title*

380 S. First St.
Suite 110
San Jose, CA 95113
*Server's address*

Additional information regarding attempted service, etc:

Ex. 5 to Middlen Declaration                                      Ex. 1 to Memorandum

## Police presence was strong throughout the WrestleMania week of events, driving counterfeiters away:



**Security inside the stadium was abundant:**









Ex. 5 to Middlen Declaration

Ex. 1 to Memorandum





Ex. 5 to Middlen Declaration

Ex. 1 to Memorandum



Ex. 5 to Madden Declaration

Ex. 1 to Memorandum

# Nevertheless, we know we'll be "hit" throughout the year when the police presence is not so prevalent…

**JANUARY 25, 2015 – PHILADELPHIA, PENNSYLVANIA:**
(about twelve different men selling bootleg at this event)





(front)                                               (back)

***\*\*\* This is the same "Live Raw/SmackDown 2015 Design"
that is sold repeatedly in different cities.***

## <u>FEBRUARY 3, 2015 – COLORADO SPRINGS, COLORADO</u>:

Our venue merchandise coordinator reported to WWE Legal: "Bootlegged heavy tonight in Co Springs. I chased them off of the front steps as there were 8 guys lined up right in front of the main entrance. They just went down to the street and parking lot and continued to sell. I didn't confiscate any shirts but it was the same weak tour shirt that we have seen the last couple of weeks. Each guy had a bag full of shirts instead of the normal act of just keeping a couple on them at a time."





Ex. 5 to Middlen Declaration

Ex. 1 to Memorandum

# MARCH 7, 2015: - NEWARK, NEW JERSEY:

 

*** *This is the same "Live Raw/SmackDown 2015 Design"*
*that is sold repeatedly in different cities.*

## MARCH 10, 2015 – DETROIT, MICHIGAN:
## (local police sent these photos to WWE)

- *__Two different men__ were selling the identical shirt on this night.*

- *This is the same "Live Raw/SmackDown 2015 Design" that is sold repeatedly in different cities.*





Ex. 5 to Middlen Declaration

Ex. 1 to Memorandum

## Counterfeit Product Sold at WWE Live Events:

- **Traditionally sized for children to wear**

- **Inferior shirt quality – could be flammable**

- **Inferior ink quality – could be flammable, cause allergic reactions**

- **Counterfeiters keep them "stored" in their pants until sale is made**

- **Often have strong, adverse odors not noticed until indoors**

## POSE A SIGNIFICANT PUBLIC SAFETY RISK!

# EXHIBIT 6

# Police/Security presence was extremely strong throughout the WrestleMania week of events which is uncommon for WWE live events

# <u>WrestleMania Axxess…</u>

## *Located at the Kay Bailey Hutchison Convention Center – Dallas, TX*

- *Fan/Talent interactive events*
- *Talent signings*
- *WWE "Superstore"*



Ex. 6 to Michael Declaration

# Police presence surrounding WrestleMania Axxess…



3

# Police presence surrounding WrestleMania Axxess…





Ex. 6 to Middlen Declaration

# Police presence surrounding WrestleMania Axxess…





# Police presence surrounding WrestleMania Axxess…



Ex. 6 to Middlen Declaration

Ex. 1 to Memorandum

6

# WRESTLEMANIA 32 – Main Event

**(located at the AT&T Stadium – Arlington, TX)**

- *101,763 people in attendance*
- *Fans came from all 50 states and more than 30 countries*



# WRESTLEMANIA 32



# Police presence surrounding WrestleMania 32...



# Police presence surrounding WrestleMania 32…



# Police presence surrounding WrestleMania 32…





# Police presence surrounding WrestleMania…





# Police presence surrounding WrestleMania…







Ex. 6 to Middlen Declaration



Ex. 1 to Memorandum

13

# Police presence surrounding WrestleMania 32…







Ex. 6 to Middlen Declaration

Ex. 1 to Memorandum

14

# Police/Security presence surrounding WrestleMania 32…



**Even with all of the police and security,
WWE encountered counterfeit
WWE merchandise being sold during
the hours leading up to the event…**

# In a nearby parking lot of one of the streets leading to the AT&T Stadium…  <u>Counterfeit Posters being sold:</u>

## *More than <u>150</u> counterfeit posters still in his possession…*





Ex. 6 to Middlen Declaration

Ex. 1 to Memorandum

# Counterfeit Posters being sold:

## Poster 2

## Poster 1





# Counterfeit Posters being sold:

**Poster 3**



**Poster 4**



# **Counterfeit Posters being sold:**

**Poster 5**



**Poster 6**



# Counterfeit Posters being sold:

**Poster 7**



**Poster 8**



# Counterfeit Posters being sold:

**Poster 9**



**Poster 10**



# **Counterfeit Posters being sold:**

**Poster 11**



**Poster 12**



# Counterfeit Posters being sold:

**Poster 13**



# The seller was arrested for selling counterfeit merch:





**In another nearby parking lot of one of the streets leading to the AT&T Stadium…**

**<u>Counterfeit Shirts being sold – all identical:</u>**

- *More than <u>60</u> counterfeit shirts still in his possession.*

- *He advised the officers that he had already sold more than <u>50</u> shirts.*

- *He advised the officers that there were at least four other men selling these shirts that day.*

- *He had <u>travelled from Florida </u>to sell the shirts at WWE's event.*

# Counterfeit Shirts being sold:

## Shirt Front:



## Shirt Back:



# The seller was arrested for selling counterfeit merch:



After the WrestleMania event was over and fans were returning to their cars, we located two men selling the identical shirt <u>in the AT&T stadium parking lots.</u>

One of the sellers was <u>*the same Florida man who had been arrested earlier that day*</u> for selling the same Counterfeit shirts.  The other seller was also from Florida.

- They had approximately <u>50 shirts in their hands</u>.

- They voluntarily surrendered the shirts.

- They admitted that they had already sold more than <u>150 shirts</u> that that evening.

# The two men selling counterfeit shirts:



Ex. 6 to Middlen Declaration





Ex. 1 to Memorandum

# Counterfeit Shirts being sold again:

**Shirt Front:**

**Shirt Back:**





# They consented to the officers opening the trunk of their car, where we found more than <span style="color:red;">250 additional shirts</span>:



Ex. 6 to Middlen Declaration



Ex. 1 to Memorandum

32

# Counterfeit Shirts being sold again:



# COUNTERFEIT MERCHANDISE RESULTS:

**Posters:** More than **150 units** found in seller's possession

**Shirts:** More than **310 units** found in seller's possession (admitted to having sold **200** additional shirts)

# We also know we'll be "hit" throughout the year when the police presence is not so prevalent…

# The following slides depict counterfeit merchandise we encountered at other live events
# leading up to WrestleMania…

# Anaheim, CA – February 15, 2016

WWE seized the following shirts through enforcement of C.D. Cal. nationwide seizure order:



(front)



(back)

***\*\*note that the identical shirt was sold the next day in Ontario, Canada.\*\****

## <u>Ontario, Canada – February 16, 2016:</u>





(front)                                                    (back)

***note that the identical shirt was being sold the previous day in Anaheim, CA***

## Ontario, Canada – February 16, 2016:



(front)



(back)

*\*\*note that they are still selling off their old, existing inventory from 2014/2015\*\**

## Ontario, Canada – February 16, 2016:





(front)                    (back)

## Ontario, Canada – February 16, 2016:



(front)



(back)

# Detroit, MI – February 22, 2016

WWE seized the following shirts through enforcement of C.D. Cal. nationwide seizure order:



Five or six different men selling this shirt at the event at different locations near WWE live event venue.

Several hundred identical shirts being sold.

This same shirt back design was sold at WWE live events in Michigan, Illinois, Pennsylvania, Massachusetts, New York, Maryland, DC and New Jersey.

Ex. 6 to Middlen Declaration

Ex. 1 to Memorandum

41

# Chicago, IL – March 8, 2016

Merch Crew advised:   "Total of 10 guys tonight all came in 2 vans."  Through enforcement of C.D. Cal. nationwide seizure order, WWE learned that those individuals selling counterfeit merchandise in Chicago were all from Michigan where WWE had held an event a week earlier.









Ex. 6 to Middlen Declaration

Ex. 1 to Memorandum

42

## Chicago, IL – March 8, 2016

WWE seized the following shirts through enforcement of C.D. Cal. nationwide seizure order:



(front)



(back)

*(this same shirt back design was also sold in Michigan, Pennsylvania, Massachusetts, New York, Maryland, DC and New Jersey)*

## Chicago, IL – March 8, 2016

WWE seized the following shirts through enforcement of C.D. Cal. nationwide seizure order:





(front)

(back)

## Chicago, IL – March 8, 2016

WWE seized the following shirts through enforcement of C.D. Cal. nationwide seizure order:



(front)



(back)

***note that they are still selling off their old, existing inventory from 2015***

## Pittsburgh, PA – March 14, 2016

WWE learned, through enforcement of C.D. Cal. nationwide seizure order, that there were seven sellers, six of whom didn't have any ID, and the one that did was from Ohio.





(front)

(back)

*(this identical shirt was also sold the previous week at WWE live events in Pittsburgh, PA)*

# Philadelphia, PA – March 21, 2016

WWE seized the following shirts through enforcement of C.D. Cal. nationwide seizure order:



(front)



(back)

*(this identical shirt was also sold in Massachusetts, New York, DC and Maryland)*

## Boston, MA – March 22, 2016

WWE seized the following shirts through enforcement of C.D. Cal. nationwide seizure order (seized from two different men at the WWE live event):



(front)



(back)

*(this identical shirt was also sold in Pennsylvania, New York, DC and Maryland)*

# New York, NY – March 25, 2016



(front)                              (back)

***(this identical shirt was also sold in Pennsylvania, Massachusetts, DC and Maryland)***

# Washington, D.C.  – March 27, 2016



(front)



(back)

*(this identical shirt was also sold in Pennsylvania, Massachusetts, New York and Maryland)*

 50

## Baltimore, MD – March 27, 2016



(front)



(back)

***(this identical shirt was also sold in Pennsylvania, Massachusetts, New York and DC)***

## Brooklyn, NY – March 28, 2016





(front)                                  (back)

*(this same shirt back design was also sold in Michigan, Illinois, Pennsylvania, Massachusetts, Maryland, DC and New Jersey)*

## Brooklyn, NY – March 28, 2016



(front)                                        (back)

***(this identical shirt was also sold in Pennsylvania, Massachusetts, DC and Maryland)***



**Brooklyn, NY – March 28, 2016**



(front)



(back)

*(this identical shirt was also sold the previous week at WWE live events in Pittsburgh, PA)*

# The following slides depict counterfeit merchandise we have encountered at our other live events since last year's **WrestleMania Events** …

## Dublin (4/21/16):  Counterfeit shirts being sold:





(front)

(back)

## Newark, New Jersey (5/22/16):  Counterfeit shirts being sold:





(front)                                                    (back)

*(this same shirt back design was also sold in Michigan, Illinois, Pennsylvania, Massachusetts, New York, Maryland and DC in March 2016)*



This <u>identical</u> shirt back design has been used on shirts in the following <u>locations, on the following dates</u>:

| <u>City</u> | <u>State</u> | <u>Date</u> |
|---|---|---|
| Detroit | MI | Feb. 22, 2016 |
| Chicago | IL | March 8, 2016 |
| Philadelphia | PA | March 21, 2016 |
| Boston | MA | March 22, 2016 |
| New York | NY | March 25, 2016 |
| Baltimore | MD | March 27, 2016 |
| Washington | DC | March 27, 2016 |
| Brooklyn | NY | March 28, 2016 |
| Newark | NJ | May 22, 2016 |

**This design is <u>not</u> used by WWE.**

## Newark, New Jersey (5/22/16):  Counterfeit posters being sold:



**Philadelphia, PA**
**December 11, 2016**

**Advised by WWE Merch Crew that there were approximately 100 of the following shirts being sold, with some of the sellers having come from New York.**





(front)

(back)

**Philadelphia, PA**
**December 11, 2016**





(back)

(front)

## San Antonio, TX
## January 2, 2017



(front)

# The following pages are four citations that were issued by the Financial Crimes Supervisor, White Collar Crimes Detail of San Antonio, Texas on January 29, 2017 for the selling of counterfeit shirts at a WWE live event:

# Citation #1:



**POLICE REPORT**

**San Antonio Police Department**

| Offense Case # | Incident Type | CFS Number |
|---|---|---|
| SAPD17022815 | POLICE REPORT | SAPD-2017-0106814 |

| Primary Offense | |
|---|---|
| TRADEMARK COUNTERFEITING $20 BUT LESS THAN $500 | Page 1 of 2 |

| Date / Time Occurred | Date / Time Reported |
|---|---|
| 1/29/2017 14:40 to 1/29/2017 14:46 | 1/29/2017 14:46 |

| Situation Found | Type Of Search | Location Given By Dispatcher | Related Case # |
|---|---|---|---|
| Miscellaneous | None | | |

| Hate Crime | Arson | Damage Value | Clearance |
|---|---|---|---|

## Elements of the Incident

☐ Video   ☐ Domestic Violence   ☐ Drive by Shooting   ☐ Gang Related   ☐ High Profile   ☐ Juvenile Related   ☐ Video Surveillance Available   ☐ Video Surveillance Received

| Street Address | | | | | | Unit Type |
|---|---|---|---|---|---|---|
| 900 E COMMERCE ST | | | | | | |
| Unit No. | City | State | | Zip | County | Building No. |
| | SAN ANTONIO | Texas | | 78205 | Bexar County | |
| Floor No. | District | | | | | |
| | 2110 | | | | | |

| ☐ Notified Detective | Detective Name | Detective Unit Type | Detective Badge # |
|---|---|---|---|

| ☐ Notified Supervisor | Supervisor Name | Supervisor Unit Type | Supervisor Badge # |
|---|---|---|---|

| ☐ Notified Medical Examiner | Medical Examiner Name | Medical Examiner Unit Type | Medical Examiner Badge # |
|---|---|---|---|

| ☐ Notified Crisis Response Team | Crisis Response Name |
|---|---|

| ☐ Priority Notification | Priority Name |
|---|---|

| ☐ Notified Victim | Explanation |
|---|---|

| ☐ CSI Requested | CSI Name | CSI Unit Type | CSI Badge # |
|---|---|---|---|

| ☐ BOLO | Reporting Officer | Employee Number |
|---|---|---|
| | BOWER, GARY | 00108426 |

| Badge # | Assignment |
|---|---|
| 2202 | Forgery Detail |

| ☑ Primary Offense | Report Offense |
|---|---|
| | TRADEMARK COUNTERFEITING $20 BUT LESS THAN $500 |

| UCR Category | Attempted Completed |
|---|---|
| 250313 | Completed |

| Premise | Circumstances | Weapon |
|---|---|---|
| Highway/Road/Alley/Street | | UNARMED |

| Weapon Brand | Weapon Model | Weapon Color |
|---|---|---|

| Criminal Activity 1 | Criminal Activity 2 | Criminal Activity 3 |
|---|---|---|
| CA2 - FILED AT LARGE | CA2 - CITATION ISSUED | NONE |

| ☐ Primary Offense | Report Offense |
|---|---|
| | ORD VIOL |

| UCR Category | Attempted Completed |
|---|---|
| 000033 | Completed |

| Premise | Circumstances | Weapon |
|---|---|---|
| Highway/Road/Alley/Street | | UNARMED |

| Weapon Brand | Weapon Model | Weapon Color |
|---|---|---|

| Criminal Activity 1 | Criminal Activity 2 | Criminal Activity 3 |
|---|---|---|
| CA2 - CITATION ISSUED | NONE | NONE |

**SUSPECT** ☑ Known

| Last Name | First Name | Middle Name | Nickname | Suffix |
|---|---|---|---|---|
| DICKERSON | BURELL | | | |

| Race | Sex | SSN | Date of Birth | Age | Age Range | Weight |
|---|---|---|---|---|---|---|
| BLACK | Male | | 07/07/1974 | 42 | | 260 |

| Height | Driver's License # | DL State | Place of Birth | | SID |
|---|---|---|---|---|---|
| 6'01" | 802863945 | Mississippi | | | |

| Preferred | Home Phone | Cell Phone | Email Address |
|---|---|---|---|
| CELL PHONE | | 646-649-6853 | |

Suspect Address

**POLICE REPORT**

## San Antonio
## Police Department

| Offense Case # | Incident Type | CFS Number |
|---|---|---|
| SAPD17022815 | POLICE REPORT | SAPD-2017-0106814 |

| Primary Offense | | |
|---|---|---|
| TRADEMARK COUNTERFEITING $20 BUT LESS THAN $500 | | Page 2 of 2 |

| Date / Time Occurred | | Date / Time Reported |
|---|---|---|
| 1/29/2017 14:40   to   1/29/2017 14:45 | | 1/29/2017 14:45 |

| Street Address | | | | | | Unit Type |
|---|---|---|---|---|---|---|
| 2721 COLUMBIA | | | | | | |

| Unit No. | City | State | Zip | Building No | Floor No. |
|---|---|---|---|---|---|
| | PRENTISS | Mississippi | 39474 | | |

☐ Student    Employer    Occupation

**Suspect Employer Address**

| Street Address | | | | | | Unit Type |
|---|---|---|---|---|---|---|

| Unit No. | City | State | Zip | Building No | Floor No. |
|---|---|---|---|---|---|
| | SAN ANTONIO | Texas | | | |

**Details**

| Work Phone | Hours of Employment to | Hair Color | Hair Length | ☐ Glasses | Eye Color |
|---|---|---|---|---|---|
| | | Black | Ear Top | | Brown |

| Build | Facial Hair | Facial Hair Color | Voice | Complexion |
|---|---|---|---|---|
| Heavy | | | GRUFF OR HARSH VOICE | Dark |

| Ethnicity | Marital Status | Demeanor | Hand Preference |
|---|---|---|---|
| Non-Hispanic | | | |

Shirt    Jacket

Pants    Shoes

Hat

**Racial Profiling**

| Traffic Stop | Was Suspect Driving Car | Race Known Prior to Stop | Reason for Stop |
|---|---|---|---|
| ☐ Yes ☑ No | ☐ Yes ☑ No | ☑ Yes ☐ No | Violation of Law |

| Location of Stop | Contraband or Evidence | Race | Ethnicity |
|---|---|---|---|
| City Street | Other | BLACK | Non-Hispanic |

Trademarks of Suspect

**Narrative Legend**

SP1 = DICKERSON, BURELL

**Narrative Information**

I was at the above location looking for vendors selling counterfeit trademarked items.  While in my vehicle I observed the SP selling Black WWE Royal Rumble T-shirts from the sidewalk.  The SP was holding up a shirt to display to passing cars and had several other shirts over his shoulder.  After spotting myself and Sgt. Castello #3124 approaching him, the SP walked briskly away and was contacted several blocks away.  The SP was still in possession of three counterfeit WWE T-shirts.  The shirts had the WWE Royal Rumble logo but were printed on "seconds" quality shirts.  The SP was selling the shirts for $10 and was selling them inside the downtown business district against city ordinance.  SP was issued misdemeanor citation X1444477 for peddling in the downtown business district and was advised a criminal case of trademark counterfeiting less then $100 would be filed at large.

# Citation #2:

**San Antonio Police Department**

| Offense Case # | Incident Type | CFS Number |
|---|---|---|
| SAPD17022847 | POLICE REPORT | SAPD-2017-0106955 |

| Primary Offense | | |
|---|---|---|
| TRADEMARK COUNTERFEITING $20 BUT LESS THAN $500 | | Page   1    of   2 |

| Date / Time Occurred | | Date / Time Reported |
|---|---|---|
| 1/29/2017 15:20    to    1/29/2017 15:25 | | 1/29/2017 15:30 |

| Situation Found | Type Of Search | Location Given By Dispatcher | Related Case # |
|---|---|---|---|
| Miscellaneous | Plain View | | |

| Hate Crime | | Arson | | Damage Value | Clearance | |
|---|---|---|---|---|---|---|

## Elements of the Incident

☐ Video   ☐ Domestic Violence   ☐ Drive by Shooting   ☐ Gang Related   ☐ High Profile   ☐ Juvenile Related   ☐ Video Surveillance Available      ☐ Video Surveillance Received

| Street Address | Unit Type |
|---|---|
| 200 IOWA ST | |

| Unit No. | City | State | Zip | County | Building No. |
|---|---|---|---|---|---|
| | SAN ANTONIO | Texas | 78210 | Bexar County | |

| Floor No. | District |
|---|---|
| | 4120 |

| ☐ Notified Detective | Detective Name | Detective Unit Type | Detective Badge # |
|---|---|---|---|

| ☐ Notified Supervisor | Supervisor Name | Supervisor Unit Type | Supervisor Badge # |
|---|---|---|---|

| ☐ Notified Medical Examiner | Medical Examiner Name | Medical Examiner Unit Type | Medical Examiner Badge # |
|---|---|---|---|

| ☐ Notified Crisis Response Team | Crisis Response Name |
|---|---|

| ☐ Priority Notification | Priority Name |
|---|---|

| ☐ Notified Victim | Explanation |
|---|---|

| ☐ CSI Requested | CSI Name | CSI Unit Type | CSI Badge # |
|---|---|---|---|

| ☐ BOLO | | Reporting Officer | Employee Number |
|---|---|---|---|
| | | BOWER, GARY | 00108426 |

| Badge # | Assignment |
|---|---|
| 2202 | Forgery Detail |

| ☑ Primary Offense | Report Offense |
|---|---|
| | TRADEMARK COUNTERFEITING $20 BUT LESS THAN $500 |

| UCR Category | Attempted Completed |
|---|---|
| 250313 | Completed |

| Premise | Circumstances | Weapon |
|---|---|---|
| Highway/Road/Alley/Street | | UNARMED |

| Weapon Brand | Weapon Model | Weapon Color |
|---|---|---|

| Criminal Activity 1 | Criminal Activity 2 | Criminal Activity 3 |
|---|---|---|
| CA2 - FILED AT LARGE | NONE | NONE |

| ☐ Primary Offense | Report Offense |
|---|---|
| | ORD VIOL |

| UCR Category | Attempted Completed |
|---|---|
| 000033 | |

| Premise | Circumstances | Weapon |
|---|---|---|
| Highway/Road/Alley/Street | | UNKNOWN |

| Weapon Brand | Weapon Model | Weapon Color |
|---|---|---|

| Criminal Activity 1 | Criminal Activity 2 | Criminal Activity 3 |
|---|---|---|
| CA2 - CITATION ISSUED | NONE | NONE |

**SUSPECT   ☑ Known**

| Last Name | First Name | Middle Name | Nickname | Suffix |
|---|---|---|---|---|
| PITTS | CARL | ANTHONY | | |

| Race | Sex | SSN | Date of Birth | Age | Age Range | Weight |
|---|---|---|---|---|---|---|
| BLACK | Male | | 05/17/1964 | 52 | to | 210 |

| Height | Driver's License # | DL State | Place of Birth | SID |
|---|---|---|---|---|
| 5'11" | | Michigan | | |

| Preferred | Home Phone | Cell Phone | Email Address |
|---|---|---|---|
| CELL PHONE | | 313-633-4646 | |

Suspect Address

# POLICE REPORT

## San Antonio
## Police Department

| | |
|---|---|
| Offense Case # SAPD17022847 | Incident Type POLICE REPORT |
| Primary Offense TRADEMARK COUNTERFEITING $20 BUT LESS THAN $500 | |
| | CFS Number SAPD-2017-0106955 |
| | Page  2   of  2 |
| Date / Time Occurred 1/29/2017 15:20  to  1/29/2017 15:25 | Date / Time Reported 1/29/2017 15:30 |

| Street Address 18053 ROSELAWN | | | | | | Unit Type | |
|---|---|---|---|---|---|---|---|
| Unit No. | City DETROIT | State Michigan | | Zip 48221 | Building No | | Floor No. |

| Student | Employer | | Occupation |
|---|---|---|---|

### Suspect Employer Address

| Street Address | | | | | | Unit Type | |
|---|---|---|---|---|---|---|---|
| Unit No. | City SAN ANTONIO | State Texas | | Zip | Building No | | Floor No. |

### Details

| Work Phone | Hours of Employment to | Hair Color Black | Hair Length Ear Top | ☐ Glasses | Eye Color Brown |
|---|---|---|---|---|---|
| Build Heavy | Facial Hair | Facial Hair Color | Voice | | Complexion Medium Brown |
| Ethnicity Non-Hispanic | Marital Status | Demeanor | | Hand Preference | |
| Shirt | | Jacket | | | |
| Pants | | Shoes | | | |
| Hat | | | | | |

### Racial Profiling

| Traffic Stop ☐ Yes ✓ No | Was Suspect Driving Car ☐ Yes ✓ No | Race Known Prior to Stop ✓ Yes ☐ No | Reason for Stop Violation of Law | |
|---|---|---|---|---|
| Location of Stop City Street | Contraband or Evidence Other | | Race BLACK | Ethnicity Non-Hispanic |

Trademarks of Suspect

Narrative Legend

SP1 - PITTS, CARL ANTHONY

Narrative Information

I was at the above location looking for vendors selling counterfeit trademarked items. While in my vehicle I observed the SP selling Black WWE Royal Rumble T-shirts from the sidewalk. The SP was holding up a shirt to display to passing cars and had several other shirts over his shoulder. The SP was  in possession of four counterfeit WWE  T-shirts.  The shirts had the WWE Royal Rumble logo but were printed on "seconds" quality shirts.  The SP was selling the shirts for $10 and was selling them inside the downtown business district against city ordinance.  SP was issued misdemeanor citation X1444478 for peddling in the downtown business district and was advised a criminal case of trademark counterfeiting less than $100 would be filed at large.

**Citation #3:**

| POLICE REPORT | | San Antonio Police Department | Offense Case # SAPO17022875 | Incident Type POLICE REPORT | CFS Number SAPO-2017-0107034 |
|---|---|---|---|---|---|
| | | | Primary Offense TRADEMARK COUNTERFEITING $100 TO<$750 | | Page 1 of 3 |
| | | | Date / Time Occurred 1/29/2017 00:00 to 1/29/2017 16:45 | | Date / Time Reported 1/29/2017 17:00 |

| Situation Found | | Type Of Search | | Location Given By Dispatcher | | Related Case # |
|---|---|---|---|---|---|---|
| Miscellaneous | | Frisk | | | | |
| Hate Crime | | Arson | | Damage Value | Clearance | |

### Elements of the Incident

| ☐ Video | ☐ Domestic Violence | ☐ Drive by Shooting | ☐ Gang Related | ☐ High Profile | ☐ Juvenile Related | ☐ Video Surveillance Available | ☐ Video Surveillance Received |
|---|---|---|---|---|---|---|---|

| Street Address | | | | | | Unit Type |
|---|---|---|---|---|---|---|
| CENTER ST & N MESQUITE ST | | | | | | |
| Unit No. | City | State | | Zip | County | Building No. |
| | SAN ANTONIO | Texas | | 78202 | | |
| Floor No. | | District 4120 | | | | |

| Notified Detective | Detective Name | Detective Unit Type | Detective Badge # |
|---|---|---|---|
| Notified Supervisor | Supervisor Name | Supervisor Unit Type | Supervisor Badge # |
| Notified Medical Examiner | Medical Examiner Name | Medical Examiner Unit Type | Medical Examiner Badge # |
| Notified Crisis Response Team | Crisis Response Name | | |
| Priority Notification | Priority Name | | |
| Notified Victim | Explanation | | |
| CSI Requested | CSI Name | CSI Unit Type | CSI Badge # |

| BOLO | | Reporting Officer COLDEWEY, DAVID | | Employee Number 00101984 |
|---|---|---|---|---|
| Badge # 2009 | | Assignment Patrol Division | | |

| ☑ Primary Offense | Report Offense TRADEMARK COUNTERFEITING $100 TO<$750 | | |
|---|---|---|---|
| UCR Category 268002A | | Attempted Completed | |
| Premise | Circumstances | | Weapon |
| Parking Lot/Garage | | | UNARMED |
| Weapon Brand | | Weapon Model | Weapon Color |
| Criminal Activity 1 CA2 - FILED AT LARGE | | Criminal Activity 2 CA2 - CITATION ISSUED | Criminal Activity 3 NONE |

| ☐ Primary Offense | Report Offense ORD VIOL | | |
|---|---|---|---|
| UCR Category 000033 | | Attempted Completed | |
| Premise | Circumstances | | Weapon |
| Parking Lot/Garage | | | UNARMED |
| Weapon Brand | | Weapon Model | Weapon Color |
| Criminal Activity 1 CA2 - CITATION ISSUED | | Criminal Activity 2 NONE | Criminal Activity 3 NONE |

| SUSPECT ☑ Known | | | | | | |
|---|---|---|---|---|---|---|
| Last Name MARCOVITCH | | First Name ANTHONY | Middle Name | Nickname | | Suffix |
| Race BLACK | Sex Male | SSN | Date of Birth 12/20/1972 | Age 44 | Age Range | Weight 140 |
| Height 5'4" | Driver's License # 959914913 | DL State New York | | Place of Birth | SID | |
| Preferred CELL PHONE | | Home Phone | Cell Phone 917-415-6288 | | Email Address | |
| | | | Suspect Address | | | |

**POLICE REPORT**

**San Antonio Police Department**

| | |
|---|---|
| Offense Case # | SAPD17022875 |
| Incident Type | POLICE REPORT |
| CFS Number | SAPD-2017-0107034 |

| Primary Offense |
|---|
| TRADEMARK COUNTERFEITING $100 TO<$750 |

| Date / Time Occurred | | Date / Time Reported |
|---|---|---|
| 1/29/2017 00:00  to  1/29/2017 15:45 | Page 2 of 3 | 1/29/2017 17:00 |

| Street Address | | | | | Unit Type |
|---|---|---|---|---|---|
| 3250 3RD AVE | | | | | |
| Unit No. | City SAN ANTONIO | State New York | Zip 10456 | Building No | Floor No. |

☐ Student | Employer | | Occupation |

**Suspect Employer Address**

| Street Address | | | | | Unit Type |
|---|---|---|---|---|---|
| Unit No. | City SAN ANTONIO | State Texas | Zip | Building No | Floor No. |

**Details**

| Work Phone | Hours of Employment to | Hair Color | Hair Length | ☐ Glasses | Eye Color |
|---|---|---|---|---|---|
| Build | Facial Hair | Facial Hair Color | Voice | | Complexion |
| Ethnicity Non-Hispanic | Marital Status | Demeanor | Hand Preference | | |

| Shirt | Jacket |
|---|---|
| Pants | Shoes |
| Hat | |

**Racial Profiling**

| Traffic Stop | Was Suspect Driving Car | Race Known Prior to Stop | Reason for Stop |
|---|---|---|---|
| ☐ Yes ☑ No | ☐ Yes ☑ No | ☑ Yes ☐ No | Violation of Law |

| Location of Stop | Contraband or Evidence | Race | Ethnicity |
|---|---|---|---|
| City Street | Other | BLACK | Non-Hispanic |

Trademarks of Suspect

| **PROPERTY** ☐ Evidence | Property Tag# | Quantity | Category MISCELLANEOUS | Action SEIZED |
|---|---|---|---|---|
| Property Type | | Owner | | Value |
| Brand | Model | Color | Serial Number | |
| SRN/NIC Number | UCR Code | Secondary Action | | Secondary Value |
| Date Recovered | | | | |

Additional Description

11 ROYAL RUMBLE BLACK T-SHIRTS WW  VALUED AT 10 DOLLARS EACH

Associated Offenses

| Offense | |
|---|---|
| TRADEMARK COUNTERFEITING $100 TO<$750 | ☑ Associated With Property |
| Offense ORD VIOL | ☐ Associated With Property |

Narrative Legend

SP1 = MARCOVITCH, ANTHONY

Narrative Information

I was working in the area of the Alamo Dome in an unmarked vehicle in plain cloths checking for venders selling merchandise without a permit. While driving by the listed location I noticed SP1 with two t-shirts in his hand and he appeared to be selling them to people that were walking to the Alamo dome. I approached the suspect and identified myself as a police office and explained it was against a San Antonio city ordinance to be peddling merchandise without a permit. SP1 stated he wasn't going to lie he was selling shirts for 10 dollars each. I asked the actor for identification and he stated he didn't have any. The suspect had a large bulge under his t-shirt in his waist band and I asked him what the bulge was under his shirt and he raised his shirt where he was concealing nine more t-shirts in his waist band. The SP1 had a total of 11 T-shirts which are listed in the property section. These t-shirts were seized from SP1. SP1 was written misdemeanor citation number X1444479 for peddling without a permit. The 11 T-shirts also appeared to be trademark counterfeit t-shirts. They had WW, Royal Rumble and photos of the

| POLICE REPORT |  | **San Antonio**<br>**Police Department** | Offense Case #<br>SAPD17022875 | Incident Type<br>POLICE REPORT | CFS Number<br>SAPD-2017-0107034 |
|---|---|---|---|---|---|
| | | | Primary Offense<br>TRADEMARK COUNTERFEITING $100 TO<$750 | | Page   3      of   3 |
| | | | Date / Time Occurred<br>1/29/2017 00:00        to   1/29/2017 15:45 | | Date / Time Reported<br>1/29/2017 17:00 |

wrestlers.

## Citation #4:

| POLICE REPORT | San Antonio Police Department | Offense Case # SAPD17022896 | Incident Type POLICE REPORT | CFS Number SAPD-2017-0107104 |
|---|---|---|---|---|
| | | Primary Offense TRADEMARK COUNTERFEITING $20 BUT LESS THAN $500 | | Page 1 of 2 |
| | | Date / Time Occurred 1/29/2017 16:00 to 1/29/2017 16:01 | | Date / Time Reported 1/29/2017 16:02 |

| Situation Found Miscellaneous | Type Of Search Plain View | Location Given By Dispatcher | Related Case # |
|---|---|---|---|
| Hate Crime | Arson | Damage Value | Clearance |

### Elements of the Incident

☐ Video  ☐ Domestic Violence  ☐ Drive by Shooting  ☐ Gang Related  ☐ High Profile  ☐ Juvenile Related  ☐ Video Surveillance Available  ☐ Video Surveillance Received

| Street Address 200 E COMMERCE ST | | | | Unit Type |
|---|---|---|---|---|
| Unit No. | City NEW BRAUNFELS | State Texas | Zip 78130 | County |
| Floor No. | District SAPDO | | | Building No. |

| | Detective Name | Detective Unit Type | Detective Badge # |
|---|---|---|---|
| ☐ Notified Detective | | | |
| ☐ Notified Supervisor | Supervisor Name | Supervisor Unit Type | Supervisor Badge # |
| ☐ Notified Medical Examiner | Medical Examiner Name | Medical Examiner Unit Type | Medical Examiner Badge # |
| ☐ Notified Crisis Response Team | Crisis Response Name | | |
| ☐ Priority Notification | Priority Name | | |
| ☐ Notified Victim | Explanation | | |
| ☐ CSI Requested | CSI Name | CSI Unit Type | CSI Badge # |

| ☐ BOLO | Reporting Officer BOWER, GARY | Employee Number 00108426 |
|---|---|---|
| Badge # 2202 | Assignment Forgery Detail | |

| ☑ Primary Offense | Report Offense TRADEMARK COUNTERFEITING $20 BUT LESS THAN $500 | | |
|---|---|---|---|
| UCR Category 250313 | | Attempted Completed Completed | |
| Premise Highway/Road/Alley/Street | Circumstances | | Weapon UNKNOWN |
| Weapon Brand | Weapon Model | | Weapon Color |
| Criminal Activity 1 CA2 - FILED AT LARGE | Criminal Activity 2 NONE | | Criminal Activity 3 NONE |

| ☐ Primary Offense | Report Offense ORD VIOL | | |
|---|---|---|---|
| UCR Category 000033 | | Attempted Completed Completed | |
| Premise Highway/Road/Alley/Street | Circumstances | | Weapon UNARMED |
| Weapon Brand | Weapon Model | | Weapon Color |
| Criminal Activity 1 CA2 - CITATION ISSUED | Criminal Activity 2 NONE | | Criminal Activity 3 NONE |

| SUSPECT ☑ Known | | | | | |
|---|---|---|---|---|---|
| Last Name CAINES | | First Name JAMES | Middle Name | Nickname | Suffix |
| Race BLACK | Sex Male | SSN | Date of Birth 12/04/1982 | Age 34 | Age Range to | Weight 160 |
| Height 5'11" | Driver's License # | DL State | Place of Birth | | SID |
| Preferred CELL PHONE | Home Phone | Cell Phone 718-915-4703 | | Email Address | |
| | | Suspect Address | | | |

| POLICE REPORT | | **San Antonio** **Police Department** | | Offense Case # SAPD17022896 | | Incident Type POLICE REPORT | | CFS Number SAPD-2017-0107104 |
|---|---|---|---|---|---|---|---|---|
| | | | | Primary Offense TRADEMARK COUNTERFEITING $20 BUT LESS THAN $500 | | | | Page  2     of  2 |
| | | | | Date / Time Occurred 1/29/2017 16:00    to   1/29/2017 16:01 | | | | Date / Time Reported 1/29/2017 16:02 |

| Street Address 1050 CARROLL | | | | | | | Unit Type | |
|---|---|---|---|---|---|---|---|---|
| Unit No. | City BRONX | | State New York | | Zip 10456 | Building No | | Floor No. |

| Student | Employer | | Occupation | |
|---|---|---|---|---|

**Suspect Employer Address**

| Street Address | | | | | | Unit Type | |
|---|---|---|---|---|---|---|---|
| Unit No. | City SAN ANTONIO | State Texas | | Zip | Building No | | Floor No. |

**Details**

| Work Phone | | Hours of Employment to | Hair Color Black | | Hair Length Collar | | ☐ Glasses | Eye Color Brown |
|---|---|---|---|---|---|---|---|---|
| Build Medium | Facial Hair | | Facial Hair Color | | Voice | | Complexion | |
| Ethnicity Non-Hispanic | | Marital Status | | Demeanor | | Hand Preference | | |
| Shirt | | | | Jacket | | | | |
| Pants | | | | Shoes | | | | |
| Hat | | | | | | | | |

**Racial Profiling**

| Traffic Stop ☐ Yes  ☑ No | Was Suspect Driving Car ☐ Yes  ☑ No | Race Known Prior to Stop ☑ Yes  ☐ No | Reason for Stop Violation of Law | |
|---|---|---|---|---|
| Location of Stop City Street | Contraband or Evidence Other | | Race BLACK | Ethnicity Non-Hispanic |

Trademarks of Suspect

Narrative Legend
SP1 = CAINES, JAMES

Narrative Information

I was at the above location looking for vendors selling counterfeit trademarked items. While in my vehicle I observed the SP selling Black WWE Royal Rumble T-shirts from the sidewalk. The SP was holding up a shirt to display to passing cars and had several other shirts over his shoulder. The SP was  in possession of four counterfeit WWE T-shirts. The shirts had the WWE Royal Rumble logo but were printed on "seconds" quality shirts.  The SP was selling the shirts for $10 and was selling them inside the downtown business district against city ordinance.  SP was issued misdemeanor citation X1444480 for peddling in the downtown business district and was advised a criminal case of trademark counterfeiting less than $100 would be filed at large.

**St. Paul, MN**
**February 28, 2017**

<span style="color:red">**Advised by WWE Merch Crew that there were approximately two men, independently selling the following shirt.  Each had approximately 50 shirts.**</span>





(front)                                    (back)

**Counterfeit Product Sold at WWE Live Events:**

- **Traditionally sized for children to wear or use**

- **Inferior shirt quality – could be flammable**

- **Inferior ink quality – could be flammable, cause allergic reactions**

- **Counterfeiters keep them "stored" in their pants until sale is made**

- **Often have strong, adverse odors not noticed until indoors**

## COUNTERFEIT PRODUCT
## POSES A SIGNIFICANT PUBLIC SAFETY RISK!

Ex. 6 to Middlen Declaration

Ex. 1 to Memorandum

20

# EXHIBIT 7

# WRESTLEMANIA 33
# Events
# Orlando, Florida – 2017

# ENFORCEMENT REPORT

# WrestleMania Axxess…

## Located at the Orange County Convention Center – Orlando, FL

- *Fan/Talent interactive events*
- *Talent signings*
- *WWE "Superstore"*



# WrestleMania Axxess…



# WrestleMania Axxess…



Ex. 7 to Middlen Declaration

Ex. 1 to Memorandum

**Police and Security presence was extremely strong throughout the WrestleMania week of events, either driving counterfeiters away or forcing them to go deeper into hiding…**

# Police presence surrounding WrestleMania Axxess…







Ex. 7 to Middlen Declaration

Ex. 1 to Memorandum

6

# Police presence surrounding WrestleMania Axxess…



Ex. 7 to Middlen Declaration

Ex. 1 to Memorandum

# Police presence surrounding WrestleMania Axxess…



# Police presence surrounding WrestleMania Axxess…



# WWE Hall of Fame Event…

*Located at the Amway Center – Orlando, FL*

- *Live ceremony event similar to the Oscars - honoring those who have achieved success in the sports entertainment industry*



# WWE Hall of Fame Event…



# Police presence surrounding WWE Hall of Fame Event…



**(many closed roads to direct traffic to directed paths)**

# Police presence surrounding WWE Hall of Fame Event…



# Police presence surrounding WWE Hall of Fame Event…



# Police presence surrounding WWE Hall of Fame Event…



# Police presence surrounding WWE Hall of Fame Event…



# Police presence surrounding WWE Hall of Fame Event…



**Even with all of the police and security, we were able to find counterfeit WWE merchandise being sold during the hours leading up to the WWE Hall of Fame event…**

# Location of Sale of
# Counterfeit Merchandise Sold at WWE Hall of Fame Event…



# Location of Sale of
# Counterfeit Merchandise Sold at WWE Hall of Fame Event…

**Path under highway led directly to Amway Center**



# Counterfeit Merchandise Sold at WWE Hall of Fame Event...



# Counterfeit Merchandise Sold at WWE Hall of Fame Event…



# Counterfeit Merchandise Seller at WWE Hall of Fame Event…



**Was found selling counterfeit WWE hats.**
**At the time of seizure, she had 19 remaining In her possession.**
**She was served and the 19 hats were seized without incident.**

# Counterfeit Merchandise Sold at WWE Hall of Fame Event…





**(outside)**                    **(inside)**

# Counterfeit Merchandise Seller at WWE Hall of Fame Event…



**Was found selling counterfeit WWE hats.**
**At the time of seizure, she had 20 remaining In her possession.**
**She was served and the 20 hats were seized without incident.**

# Counterfeit Merchandise Sold at WWE Hall of Fame Event…





**(outside)**                    **(inside)**

# WRESTLEMANIA 33



# WRESTLEMANIA 33 – Main Event

## (located at the Camping World Stadium – Orlando, FL)

- *Pinnacle annual live event for WWE*
- *75,245 people in attendance*
- *Fans came from all 50 states and more than 20 countries*



# Police presence surrounding WrestleMania 33...



Ex. 7 to Middlen Declaration

Ex. 1 to Memorandum

29

# Police presence surrounding WrestleMania 33…







Ex. 7 to Middlen Declaration



Ex. 1 to Memorandum

# Police presence surrounding WrestleMania 33…



# Police presence surrounding WrestleMania 33…







Ex. 7 to Madden Declaration



Ex. 1 to Memorandum

# Police presence surrounding WrestleMania 33…



# Police presence surrounding WrestleMania 33…



# Police presence surrounding WrestleMania 33…



Ex. 7 to Middlen Declaration

Ex. 1 to Memorandum

35

# Police presence surrounding WrestleMania 33…



**Even with all of the police and security, we were able to find counterfeit WWE merchandise being sold during the hours leading up to the WrestleMania 33 Event…**

# Counterfeit Merchandise Seller at WrestleMania 33…

### *Same woman selling hats again!*



**Was found selling counterfeit WWE hats on a street leading to the event.
At the time of seizure, she had 3 hats remaining In her possession.
She was served and the 3 hats were seized without incident.**

Ex. 1 to Memorandum

38

# Counterfeit Hats being sold:





Ex. 7 to Middlen Declaration

Ex. 1 to Memorandum

39

# Counterfeit Seller being served:





40

# Counterfeit Merchandise Sold at WrestleMania 33 …

 

**(outside)**                    **(inside)**

# Counterfeit Merchandise Seller at WrestleMania 33...

### *Same woman selling hats again!*



**Was found selling counterfeit WWE hats in a nearby parking lot where her car was parked.  She agreed to open her car trunk.  At the time of seizure, she had 141 counterfeit WWE hats remaining in her possession.  She was served and the 141 hats were seized without incident.**

Ex. 7 to Madden Declaration

Ex. 1 to Memorandum

# Counterfeit Hats in her trunk:



## Car trunk contained hats from several brands including WWE.

# Counterfeit WWE Hats being sold:



# **The counterfeit merchandise was seized:**



# Counterfeit Merchandise Sold at WrestleMania 33 …



**Seized 37 WWE knit hats.**

# Counterfeit Merchandise Sold at WrestleMania 33…



**(outside)**



**(inside)**

**Seized 92 of these hats.**

# Counterfeit Merchandise Sold at WrestleMania 33 …



**(outside)**



**(inside)**

**Seized 12 of these hats.**

# Another Counterfeit Merchandise Seller at WrestleMania 33...





**Was found selling counterfeit WWE shirts just outside the stadium.
At the time of seizure, he had 31 counterfeit WWE shirts remaining in his possession.  He was served and the 31 shirts were seized without incident.**

Ex. 7 to Middlen Declaration

Ex. 1 to Memorandum

49



**Bootlegger**

**Customer**

**Customer**





Ex. 7 to Middlen Declaration

# Counterfeit Merchandise Sold at WrestleMania 33 …





Ex. 7 to Middlen Declaration

Ex. 1 to Memorandum

# Counterfeit Merchandise Sold at WrestleMania 33 (_continued_)...





Ex. 7 to Middlen Declaration

Ex. 1 to Memorandum

53

# Counterfeit Merchandise Sold at WrestleMania 33 (*continued*)...



Ex. 7 to Middlen Declaration



Ex. 1 to Memorandum

# Counterfeit Merchandise Sold at WrestleMania 33 (_continued_)...





Ex. 7 to Middlen Declaration

Ex. 1 to Memorandum

# <u>Counterfeit Merchandise Sold at WrestleMania 33</u>
# (<u>continued</u>)...



Ex. 7 to Middlen Declaration



Ex. 1 to Memorandum

# Counterfeit Merchandise Sold at WrestleMania 33 (_continued_)...



Ex. 7 to Middlen Declaration



Ex. 1 to Memorandum

# Counterfeit Merchandise Sold at WrestleMania 33 (_continued_)...



# Counterfeit Seller was served:



# Another Counterfeit Merchandise Seller as WrestleMania 33 event was ending…

# JOHN DOE
## refused service but allowed seizure of merchandise

**Was found selling counterfeit WWE shirts a few blocks from the stadium. At the time of seizure, he had 12 counterfeit WWE shirts remaining in his possession.  He refused service but he allowed the 12 shirts to be seized without incident.**

# Counterfeit Merchandise Sold at WrestleMania 33 …



**(front)**



**(back)**

# Another Counterfeit Merchandise Seller immediately after WrestleMania 33 ended…



**Was found selling counterfeit WWE shirts a few blocks from the stadium. At the time of seizure, he had 23 counterfeit WWE shirts remaining in his possession. He was served and the 23 shirts were seized without incident.**

Ex. 7 to Middlen Declaration

Ex. 1 to Memorandum

# Counterfeit Merchandise Sold at WrestleMania 33 …



**(front)**



**(back)**

*The shirt being sold by the John Doe at 10:30pm was Identical to the shirt being sold by Donald Simon two hours later In a different location.*

# We also know we'll be "hit" throughout the year when the police presence is not so prevalent…

# The following slides depict counterfeit merchandise we have encountered already at our other live events leading up to WrestleMania…

## Dublin (4/21/16):  Counterfeit shirts being sold:

*Merch crew advised:* "There was a crew of about 8 bootleggers.  They confiscated about 100 shirts total."





(front)                              (back)

Ex. 7 to Middlen Declaration

## United Kingdom (4/22/16):  Counterfeit shirts being sold:

*Merch crew advised:* "Approx. 20 sellers here in Sheffield - no police here."



(front)

## <u>United Kingdom (4/22/16):  Counterfeit shirts being sold:</u>

<u>*Merch crew advised*</u>*:  "*Approx. 20 sellers here in Sheffield - no police here.*"*



(front)

## **Newark, New Jersey (5/22/16):  Counterfeit shirts being sold:**



(front)



This <u>identical</u> shirt back design has been used on shirts in the following <u>locations, on the following dates</u>:

| City | State | Date |
| --- | --- | --- |
| Detroit | MI | Feb. 22, 2016 |
| Chicago | IL | March 8, 2016 |
| Philadelphia | PA | March 21, 2016 |
| Boston | MA | March 22, 2016 |
| New York | NY | March 25, 2016 |
| Baltimore | MD | March 27, 2016 |
| Washington | DC | March 27, 2016 |
| Brooklyn | NY | March 28, 2016 |
| Newark | NJ | May 22, 2016 |

**This design is <u>not</u> used by WWE.**

## Newark, New Jersey (5/22/16):  Counterfeit posters being sold:



**Philadelphia, PA**
**December 11, 2016**

**Advised by WWE Merch Crew that there were approximately 100 of the following shirts being sold, with some of the sellers having come from New York.**





(front)          (back)

## Philadelphia, PA
## December 11, 2016



(front)



(back)

**San Antonio, TX**
**January 2, 2017**



(front)

St. Paul, MN
February 28, 2017

THIS IS THE SAME SHIRT THAT IS LATER SOLD IN (1) DETROIT, MI, (2) BUFFALO, NY, (3) NEW YORK CITY and (4) ALBANY, NY







(front)

(back)

**Buffalo, NY**
**March 11, 2017**

*THIS IS THE SAME SHIRT THAT WAS SOLD IN (1) ST. PAUL, MN AND IS LATER SOLD IN (2) DETROIT, MI, (2) NEW YORK CITY and (4) ALBANY, NY*





(front)　　　　　　　　　　　　　　　(back)

Ex. 7 to Middlen Declaration

New York City, NY

March 12, 2017

THIS IS THE SAME SHIRT THAT WAS SOLD IN (1) ST. PAUL, MN and (2) BUFFALO, NY
AND IS LATER SOLD IN (2) DETROIT, MI, and (4) ALBANY, NY




(front)

(back)

Ex. 7 to Middlen Declaration

Ex. 1 to Memorandum

**Detroit, MI**
**March 13, 2017**

*THIS IS THE SAME SHIRT THAT WAS SOLD IN (1) ST. PAUL, MN, (2) BUFFALO, NY and (3) NEW YORK CITY and IS LATER SOLD IN (4) ALBANY, NY*





(front)

(back)



Ex. 7 to Middlen Declaration

Ex. 1 to Memorandum

Albany, NY
March 18, 2017

THIS IS THE SAME SHIRT THAT WAS SOLD IN (1) ST. PAUL, MN, (2) BUFFALO, NY and (3) NEW YORK CITY, and (4) DETROIT, MI





(front)                                    (back)

In the weeks leading up to WrestleMania, the following identical shirt has been sold at the following WWE live events:



(front)



(back)

## LOCATION

St. Paul, Minnesota
Buffalo, New York
New York, NY
Detroit, Michigan
Albany, New York

## DATE

February 28, 2017
March 11, 2017
March 12, 2017
March 13, 2017
March 18, 2017

The following slides depict counterfeit merchandise we have encountered at our other live events since last year's <u>WrestleMania Events</u> …

Ex. 7 to Middlen Declaration

Ex. 1 to Memorandum

**<u>Brooklyn, NY (08/20/17):  Counterfeit shirts being sold by at least 11 individuals –
two of whom were selling WWE counterfeit shirts again five months later,
in January 2018:</u>**



(front)



(back)

2

## **Newark, NJ (12/19/17):  Counterfeit shirts being sold by at least 6 individuals:**



(front)



(back)

*(same bootleg shirt being sold in New York City later)*

3

# Newark, NJ (12/19/17):  Other counterfeit shirts being sold by at least 6 individuals:





(front)                                              (back)

4

# New York City, NY (12/26/17):  Counterfeit shirts being sold by at least 14 individuals:



(front)



(back)

*(same bootleg shirt being sold in Newark, NJ earlier)*

5

**New York City, NY (12/26/17):  Counterfeit shirts being sold by at least 14 individuals:**

Law enforcement advised the following:

"I'm guesstimating about 14 bootleggers last night.  These NYC guys are savvy.  Most to not carry ID on them and those that do, refuse service.  While I can't confirm many given names, there were a couple that are known to me from past interaction in both the bootleg enforcement world and my NYPD career."

6

**<u>Brooklyn, NY (01/22/18):  Counterfeit shirts being sold by at least 4 individuals –
these are the tour dates leading up to WrestleMania 34</u>:**



(front)



(back)

*(same bootleg shirt being sold in Philadelphia, PA later)*

7

**Philadelphia, PA (01/28/18): Counterfeit shirts being sold by at least 4 individuals – these are the tour dates leading up to WrestleMania 34:**



(front)



(back)

*(same bootleg shirt being sold in Brooklyn, NY earlier)*

8

## Philadelphia, PA (01/28/18):  Counterfeit shirts being sold by several individuals:



(front)



(back)

9

## Philadelphia, PA (01/28/18):  Counterfeit shirts being sold by several individuals:



(front)



(back)

10

## Philadelphia, PA (01/28/18):  Counterfeit shirts being sold by several individuals:



(front)

# **Counterfeit Product Sold at WWE Live Events:**

- **Traditionally sized for children to wear or use**

- **Inferior shirt quality – could be flammable**

- **Inferior ink quality – could be flammable, cause allergic reactions**

- **Counterfeiters keep them "stored" in their pants until sale is made**

- **Often have strong, adverse odors not noticed until indoors**

## <u>Counterfeit Product Sold at WWE Live Events</u>:

**We might not be able to find 100% of the counterfeit merchandise being sold at our events, but we must have the ability to seize 100% of what we <u>do</u> find.**

<span style="color:red">**COUNTERFEIT PRODUCT
POSES A SIGNIFICANT PUBLIC SAFETY RISK!**</span>

# EXHIBIT 8

Case # 12-10461

COX CONVENTION CENTER

**SAVOR...**

SMG Worldwide Entertainment and Convention Venue Management

FORD CENTER OKLAHOMA CITY

DATE: 2-6-12

EVENT: WWE

EVENT COLOR: GREEN X YELLOW ____ RED ____

TIME: 1815

SSN: 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 602/240 Blk/Bro

NAME: McNary, Kevin Clenard

R/S: B/M

DOB: 12-20-59

ADDRESS: 515 S. 13 St #B23 408-512-8503

CITY: Las Vegas STATE: NV ZIP: 89101

REASON FOR CONTACT: Kevin was selling bootleg WWE t-shirts. He was standing next to a line of people waiting to get in. He admitted he was selling these t-shirts and told me he bought them "down the street". Kevin admitted he follows the WWE around selling the t-shirts.
- 27 black long sleeve WWE t-shirts
- $563 cash

ticket # 09-8327395 PCI

DISPOSITION:

JAIL: X
DETOX:
CAB:
FRIEND:

RELEASED TO:

NAME:
PHONE:

EMPLOYEE:
ALCOHOL OFFICER: Varney, Lambert
MANAGER:

# EXHIBIT 9

<u>Seized Since WrestleMania XXIX:</u>

<u>Seized at WWE live events in (1) Fresno, CA, (2) Los Angeles, CA,
(3) Sacramento, CA</u>
<u>all on different dates, all from different individuals:</u>



<u>Seized at several different WWE live events throughout New York,
all on different dates, all from different people</u>:



<u>Seized at WWE live events in (1) Los Angeles, CA and (2) Sacramento, CA,
on different dates, from different people</u>:



12

Seized at WWE live event in New Jersey:



Seized at WWE live events in New York and New Jersey,
on different dates, from different people:



13

Seized at WWE live event in New Jersey:



Seized at WWE live event in Los Angeles, CA:



14

Seized at WWE live event in Los Angeles, CA:





15

Boxes of Counterfeit Merchandise Seized at Various WWE Live Events
Since WMXXIX:



16

Seized at WWE live event in Baltimore, MD in January 2014:
(Front)



17

Seized at WWE live event in Baltimore, MD in January 2014:
(Back)
Lists the different cities in which WWE live events will be held –
note that the tagline used at the top of the shirt "Let the Good Times Roll" is the tagline that
WWE is currently using in connection with WrestleMania XXX in New Orleans, LA
*(poor quality of image is actually on the original shirt and not merely a bad photograph)*



18

Seized at WWE live event in St. Louis, MO in January 2014
(Front):

